UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-60020-DIMITROULEAS/SNOW

UNITED STATES OF AMERICA

v.

JONATHAN MARKOVICH, and
DANIEL MARKOVICH,

     **Defendants.**
_____/

**UNITED STATES' RENEWED MOTION *IN LIMINE* TO PRESENT EVIDENCE OF
FALSE PATIENT STATEMENTS CREATED IN RESPONSE
TO CRIMINAL INVESTIGATION, AND NOTICE OF INTENT TO INTRODUCE
SWOWN DEPOSITION TESTIMONY OF JONATHAN MARKOVICH**

  The United States, through undersigned counsel, hereby moves *in limine* to introduce evidence regarding J. Markovich's role in creating false patient statements to conceal the ongoing health care fraud, wire fraud, and kickback conspiracies from criminal investigators. The Government is mindful of the Court's prior rulings on this topic, but understands that the Court has consistently ruled that the Government may be permitted to introduce such evidence if: (1) the defense opens the door to it; and (2) the Government can establish a sufficient foundation for Jonathan Markovich's knowledge that the recordings were false. The Government submits that Jonathan Markovich opened the door to this evidence by inquiring about other false recordings directed by Jonathan Markovich when he learned of the Government's investigation. In addition, as previously set forth in the Government's Motion for Reconsideration [D.E. 330], Mr. Garnto can lay a sufficient foundation to introduce such testimony.

  In addition, the Government moves *in limine* to introduce portions of Jonathan Markovich's prior sworn testimony in the form of a certified transcript. Of note, Jonathan

Markovich testified that he is a "micromanager," that a CEO should be involved in "daily activities" of a treatment center, and that Compass never paid for patient flights. Such testimony is both necessary to rebut information introduced by the defense in the cross-examination of Mr. Garnto (such as by minimizing Mr. Garnto's testimony that J. Markovich is a micromanager), and to show how J. Markovich lied to conceal his scheme. This evidence is admissible against J. Markovich as a statement of party opponent and, as discussed below, does not pose a *Bruton* issue with respect to D. Markovich because it either says nothing about D. Markovich or, in the case of the testimony about the absence of flight purchases, is a statement in furtherance of the conspiracy.

Finally, during cross-examination of Mr. Garnto today, Mr. Pasano opened the door to the Garland Avenue transaction by inquiring about the purpose of payments from WAR. Pre-indictment payments from WAR were primarily to fund the Garland Avenue house. Mr. Pasano even stated that these were "salary" payments and "legitimate," and continued to inquire of the purpose of these payments even after the Government objected as a warning to this issue. Mr. Garnto should be permitted to explain the purpose of these payments on redirect.

**I.    THE DEFENSE HAS OPENED THE DOOR TO EVIDENCE OF FALSE PATIENT STATEMENTS, WHICH SPEAK SQUARELY TO CRIMINAL INTENT.**

The Government renews its motion *in limine* to present evidence that J. Markovich and D. Markovich participated in the creation of false patient statements (both recordings and affidavits) in part to conceal their crimes from the FBI and Department of Justice.

While the Court has previously excluded such evidence, J. Markovich squarely opened the door to it when his counsel cross-examined Mr. Garnto regarding a false recording that Mr. Garnto created at the direction of J. Markovich. The relevant exchange between Mr. Pasano and Mr. Garnto is excerpted below:

| | |
|---|---|
| Q. | Over the years that Compass operated, there were times that lawyers got involved for one piece of work or another; is that fair to say? |
| A. | Sure. |
| Q. | And one of those lawyers was a guy named Daniel Foodman, right? |
| A. | Correct. |
| Q. | Foodman even actually helped you out in connection with problems you were having with that guy, Stelios, at the end of the relationship with Lab Pros, right? |
| A. | Correct. |
| Q. | And Foodman also got involved when rumors came up about the authorities investigating. Do you remember that? |
| A. | I do. |
| Q. | In fact, Foodman hired an investigator, a guy named Wayne Black. Do you remember that name? |
| A. | I do. |
| Q. | And you actually sat down with Mr. Black, right? |
| A. | I did. |
| Q. | And Mr. Black told you that he was going to record the conversation, and you said okay, right? |
| A. | Yes, I did. |
| Q. | And then you proceeded to tell Mr. Black that everything was fine at Compass, right? |
| A. | Not completely. |
| Q. | You lied to Mr. Black, right? |
| A. | I was told to. |
| Q. | Not my question. I appreciate that, sir. My question is: You, Chris Garnto, lied to Wayne Black, right? |
| A. | Yes. |
| Q. | You even told the FBI that you lied to him, right? |
| A. | Yes. |

Tr. Oct. 14, 2021, 207:5-208:14.

The Government's position is that the false statement by Mr. Garnto and the false patient recordings were both part of the same campaign directed by Jonathan Markovich to generate evidence for use in response to an FBI investigation. This evidence is the epitome of consciousness of guilt and the defense has long made clear that their key defense is intent. Now, through the above cross-examination, they have expressly put at issue (1) recordings conducted in response to the criminal investigation; and (2) Daniel Foodman's involvement in representing Compass in response to the investigation.

On July 30, 2020, roughly two months before charges were brought in this case, Mr. Foodman sent a letter to the FBI, attached as Exhibit A hereto, in which Mr. Foodman alluded to both "interviews and sworn statements of every employee involved in the patient intake process, numerous employees that participate in the patient treatment process," and "former patients." Mr. Foodman expressly represented to the FBI that "All former patients that were interviewed denied, under oath, receiving any benefits to obtain treatment at Compass."

Mr. Foodman further advised the FBI that "Compass has been consistently dealing with interference by its competitors, has been defamed," and that "one of its competitors had a former patient of Compass' provide a false statement, based on a written script, on video in exchange for providing illegal narcotics." Mr. Foodman requested that the FBI provide this letter to the DOJ attorneys overseeing the investigation, which were the undersigned prosecutors.

The "competitor" referenced in Mr. Foodman's letter is unnamed, but evidence will show that this refers to Evoke Detox. While Compass sued Evoke in civil court, the lawsuit was settled and dismissed <u>before</u> any of the recordings at issue occurred. After that lawsuit was dismissed with prejudice, Jonathan Markovich directed Mr. Garnto to create a recording of patient S.S., stating that Evoke had provided drugs to read a false script against Compass and that S.S. was never paid

4

to attend Compass.  In reality, as Mr. Garnto testified, "it was discussed between me and Jonathan that [S.S.] was not only going to be paid for his stay at Compass…we had a discussion about Simon coming in, wanting to be paid.  He came through Mario at the time.  Jon and I spoke about this, and I believe he got, like 500 bucks for coming to Compass." Tr. Oct. 12, 2021, 200:11-22. Mr. Garnto further testified that he discussed with S.S. "outside Compass, in my car" being paid to attend Compass.  "I think on that occasion he was given $1,000, and he wanted to, like, bring the money into the facility and he wanted to see the money.  The money was handed to him, but Mario was in the car as well.  Mario ended up holding on to the money." *Id.* 201:3-8.  S.S. was a patient at Compass when these recordings were made and had been offered money to be there.

After receiving a copy of these recordings of S.S., J. Markovich directed that S.S. sign an affidavit stating that Compass had never paid him.  Jonathan Markovich drafted and circulated the affidavit to D. Markovich and Mr. Garnto for comment, all after the Evoke civil litigation had been dismissed.  Several days later, J. Markovich received the executed affidavit of S.S., along with a similar affidavit of A.N. and a copy of FBI Special Agent Bhoge's business card.[1]

If permitted by the Court on redirect, Mr. Garnto would testify that Jonathan Markovich directed him to create a recording of patient S.S. which would, in part, state that Compass did not pay S.S.  Once Mr. Garnto provided the recording to J. Markovich, J. Markovich directed the creation of an affidavit.  Additional patients were interviewed at the direction of J. Markovich and had been paid to attend Compass, which J. Markovich knew.  The purpose of these recordings, as Mr. Garnto discussed with J. Markovich, was in part to create evidence to potentially use in

---

[1] Mr. Garnto testified that patient A.N. "was paid not only for admitting to Compass, but had a conversation with Jon about clients that [A.N.] was sending into Compass also.  So he also became a recruiter, along with quite a few other individuals. And [A.N.] would send clients in, and Jon and I would discuss which clients they were, what type of policies they had, and how [A.N.] would be compensated with money." *Id.* at 199:12-18.

response to a criminal investigation. For example, evidence that a patient stated they were not paid would make it more difficult for the patient to later come in and say that they were paid. Mr. Garnto would compare these recordings/affidavits to the patient brokering forms that patients were required to sign upon admission, regardless of whether they had been paid. The recordings, like the patient brokering forms, were used to conceal the fact that patients were in fact paid. Unlike the patient brokering forms, which existed before the Markoviches learned of the investigation, the patient recordings are even more probative of criminal intent because they were created at the same time the Markoviches learned of the investigation. Some of these recordings were ultimately provided to the undersigned prosecutors by Mr. Foodman, which Mr. Garnto and Jonathan Markovich discussed.[2]

## II.   THE DEFENSE HAS OPENED THE DOOR TO J. MARKOVICH'S PRIOR SWORN TESTIMONY ABOUT COMPASS.

In his cross-examination of Mr. Garnto, Mr. Pasano accused Mr. Garnto of minimizing his own involvement in various crimes, and of routinely exaggerating Jonathan Markovich's involvement in the criminal conduct that took place at Compass Detox and WAR. For example, in one exchange, Mr. Pasano asked the following:

---

[2] The Government refers to its Motion for Reconsideration [D.E. 330] for a more fulsome description of the foundation that Mr. Garnto could lay for J. Markovich's involvement in these recordings, as well as their relevance and the sequence of events vis-à-vis the Evoke civil litigation. If necessary, the Government could simply have Mr. Garnto discuss the recordings—limited only to what the recordings say about Compass and not what they say about Evoke—and not admit the recordings into evidence. In addition, the Government could redact from the affidavits of the patients any discussion of Evoke and leave only the discussion about whether the patients were paid to attend Compass.

Q: On Tuesday, you told this jury your opinion that Jonathan
Markovich was a micromanager.
Do you remember saying that?

A. Yes.

Q. **According to you**, very hands on, right?

A. Correct.

Q. And you said -- this is your testimony on Tuesday -- after
Jonathan Markovich was not the CEO at Compass, nothing changed.
Do you remember saying those words, under oath, in front of
this jury on Tuesday?

A. Yes.

Q. Okay. **But it wasn't true, not quite true**, was it, sir?

A. I disagree.

Q. Well, once Jonathan Markovich stopped being CEO, he spent
less and less time at Compass; isn't that true?

A. I would disagree.

Q. So all those hours he spent overseeing the construction of
WAR, and all the hours he spent making sure that the facility
got built, and then all the hours that he spent at WAR once it
was built, and then all the hours he spent at the call
center -- once it happened, according to you, nothing changed?

A.    Correct.

(Rough Transcript, October 14, 2021, Page 238:11 – 239: 7). (Emphasis added).

Defense counsel accused Mr. Garnto of lying, or at the very least exaggerating, Jonathan Markovich's level of involvement at Compass Detox both before and after Jonathan Markovich served as CEO at Compass Detox. However, Jonathan Markovich is on record providing sworn testimony that he was "a micro-manager" by his very "personality" and nature while he was CEO at Compass Detox [GX 841, 11/19/2019 Deposition Testimony at 113:4-5; see also 112:21 to 113:6], and further that in his view a CEO should be at the company they run "every single day

7

and deal with all the daily activities. ….", and that since he could not do that any longer once he went to WAR, Daniel Markovich was becoming the CEO, [id. at 10:16-11:5]. While the second statement in his deposition testimony may be consistent with what Mr. Pasano was arguing in his questions above, Mr. Pasano was also implying that Mr. Garnto was wrong to call Jonathan a micromanager at all when he stated that this was Mr. Garnto's "opinion." Mr. Markovich's own sworn testimony indicates that that he shared this same opinion of his management style, at least while he was Compass Detox's CEO.

An opposing party's statement is admissible at trial under Fed R. Evid. 801(d)(2) against the opposing party. See Fed R. Evid. 801(d)(2)(A). There is no question that the sworn testimony provided by Jonathan Markovich is admissible against him as his own statement. It has nothing to do with Daniel Markovich at all, and thus Daniel Markovich has no basis to complain. Jonathan Markovich is simply stating his view of his own role as CEO of Compass Detox. His view of himself as a "micro-manager" comports with Mr. Garnto's, and is therefore admissible because Mr. Garnto's credibility has been challenged. To the extent that Jonathan Markovich wants to introduce this same testimony to indicate that his involvement and role at Compass Detox diminished after he ceased being CEO of that facility, he can do so. But the Government should be able to introduce Jonathan Markovich's own sworn testimony to the extent that he agrees with Mr. Garnto that he was, indeed, a "micro-manager" when he was its CEO.

### III. JONATHAN MARKOVICH MADE ADMISSIONS IN HIS DEPOSITION TESTIMONY THAT CAN BE INTRODUCED IN THE GOVERNMENT'S CASE IN CHIEF.

Finally, Jonathan Markovich also testified in his deposition in GX 841, while represented by Daniel Foodman, that Compass Detox never paid for any flights for any of its patients. When asked "Has Compass Detox ever paid for a flight for a patient?", he answered, "No." GX 841, 11/19/2019 Deposition Testimony of Jonathan Markovich, at 117:12-14. This is flatly false. Indeed, the Government has presented witness testimony and e-mails showing the exact opposite, and will present additional bank records and other documentary proof that Compass Detox and Jonathan Markovich himself paid for patients' airline tickets. Such testimony is admissible against Jonathan Markovich because it is his own sworn statement, and it is also admissible against Daniel Markovich under Fed. R. Evid. 801(d)(2)(E) because it is a statement in furtherance of the conspiracy in that it continues to conceal what Defendants were doing when they provided kickbacks to patients in the form of free flights. Indeed, the very fact that Jonathan Markovich lied about this fact shows his consciousness of guilt and criminal intent.

Similarly, Jonathan Markovich testified in his deposition that he was unaware of any patients who "said they received money to come to Compass Detox[,]" and even that he was unaware of any employee reporting to him that "patients were receiving money to come to Compass Detox." Id., at 107:24-108:6. Again, this is false.[3] The Government has presented text messages and e-mails showing that Jonathan Markovich was informed of this very thing on several

---

[3] In addition, Jonathan Markovich lied in his deposition when he stated that he was not "aware" of Frank Bosch referring patients to Compass Detox. Id., at 103:15-20. Again, this is false. Indeed, Mr. Bosch was fired by Compass Detox for recruiting patients, a fact Jonathan Markovich surely knew. And just as the prior statements above have been put at issue by the defense, these statements are now admissible.

9

occasions by Compass Detox employees. Indeed, Mr. Pasano even introduced such an e-mail in his cross-examination of Mr. Garnto earlier today, namely GX 462.

It does not matter if these statements by patients and employees about patients being paid were true (they surely were); Jonathan Markovich was asked if he was aware of any patients saying they were paid, or if any Compass Detox employees reported the same. He was. But he lied anyway. The Government should be allowed to introduce such evidence. The defense has already challenged Mr. Kustura and Mr. Garnto on this subject. And Jonathan Markovich, rather than admit certain patients had made such statements, and that employees had told him that patients were saying such things—and then perhaps adding that he viewed this as untrue—instead simply denied that patients or employees ever made such statements in the first place. But they did. And he knew that. He lied under oath anyway. It is that simple.

One basis the Government has for admitting Jonathan Markovich's prior certified deposition testimony under oath in GX 841 is what defense counsel has repeatedly attempted to elicit in cross-examination of Mr. Garnto (and other witnesses). The defense has repeatedly stated that there are no contemporaneous e-mails or text messages explicitly detailing patient brokering that were sent or received by Jonathan Markovich. Mr. Garnto (and Mr. Kustura) have repeatedly answered that of course there are none because all involved were careful not to put such explicit acknowledgement of patient recruiting in e-mails, texts, or other documents. But patients did mention patients were saying they were paid to Jonathan Markovich, and so did employees. And Jonathan Markovich could not even admit this. Flights were bought by Compass detox for its patients, and Jonathan Markovich could not even admit this. This shows that Jonathan Markovich knew these things were wrong, as the Government will argue. And his prior testimony also reinforces the notion, brought up by the Government's witnesses, that even mentioning such

10

subjects (on e-mail or otherwise) was something Jonathan Markovich and his co-conspirators stayed away from.

The Government notes that if the Court is still hesitant to admit anything about the Evoke litigation as such, the transcript testimony from Jonathan Markovich's deposition can still be admitted, with the case-name on the caption redacted. The transcript marked as GX 841 is a Certified Copy; its authenticity is not in question. Neither, based on the arguments above, is its relevance and admissibility.

**IV.   J. MARKOVICH HAS OPENED THE DOOR TO THE GARLAND AVENUE REAL ESTATE TRANSACTION.**

Jonathan Markovich has also opened the door to the Garland Avenue transaction by cross-examining Mr. Garnto regarding the purpose of his payments from WAR. Mr. Garnto was not an employee of WAR; rather, he was an employee of Compass. Mr. Pasano inquired about the fact that (1) Mr. Garnto's salary came from both Compass and WAR; (2) Mr. Garnto's WAR payments were simply salary payments; and (3) Mr. Garnto's payments from Compass and WAR were all "legitimate." In reality, Mr. Garnto was never an employee of WAR and Mr. Garnto has been put in the position of trying to explain these payments while being mindful of the Court's ruling on the Garland Avenue transaction. Thus, he carefully testified that the payments were to "solve specific problems," which the Government believes is a reference to the Garland Avenue transaction. Mr. Garnto's receipts from WAR were almost all to fund the Garland Avenue transaction after Mr. Garnto was unsuccessful in getting a loan through bank statements that the Markoviches falsified (a post-indictment payment from WAR was for Ms. Behar remaining employed at WAR). Mr. Garnto has been careful in heeding the Court's ruling, even despite the defense squarely asking him about these payments. The Government objected after several

questions in an effort to warn the defense, and Mr. Pasano withdrew one question, but then returned to the topic of the purpose of payments from WAR, knowing where this would lead.

The Garland Avenue transaction is squarely relevant to both Markoviches' intent, as Mr. Garnto would testify that it was, like the Rolex and Cadillac, a way to keep Mr. Garnto in the fold and framed as a gift. The transaction occurred in response to Mr. Garnto expressing a desire to leave Compass.[4]

---

[4] The Government further describe this transaction, the falsification of bank statements, and the payments of WAR in both its Motion for Reconsideration and its notice of intent to use this evidence [D.E. 217].

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the Government's Motion *in Limine*.

Dated: October 19, 2021

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

By:   /s/ *James V. Hayes*
JAMES V. HAYES (FL Bar # A5501717)
Senior Litigation Counsel
JAMIE DE BOER (FL Bar #A5502601)
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 774-4276
James.Hayes@usdoj.gov
Jamie.DeBoer@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 19, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*James V. Hayes*