**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60020-CR-DIMITROULEAS**

**UNITED STATES OF AMERICA**

**v.**

**JONATHAN MARKOVICH,**
**and DANIEL MARKOVICH,**

              **Defendants.**
 _____/

**DEFENDANTS' MOTION FOR ARREST OF JUDGMENT**
**AND/OR FOR NEW TRIAL**

The Government – artfully utilizing overcharging, combining multiple alleged conspiracies into one, implying fraudulent intent without direct evidence, preventing presentation of defense evidence, demeaning and deriding the Defendants via incomplete and distorted portrayals of their operations, relying on experts who strayed from their role and witnesses prompted to trigger sympathy, not reasoned consideration – obtained the convictions of Jonathan and Daniel Markovich. Consequently, Defendants, Jonathan Markovich and Daniel Markovich, pursuant to Rules 33 and 34 of the Federal Rules of Criminal Procedure, move this Court to arrest judgment or alternatively for a new trial.

## I.    LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

A trial court's discretion to grant a new trial "is so 'broad in that it may weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the

verdict.'" *United States v. Devries*, 630 F.3d 1130, 1133 (8th Cir. 2011) (internal citation omitted). "The district court need not view the evidence in the light most favorable to the verdict." *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982) (internal quotation marks omitted):

> If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

There is "no incongruity or inconsistency" in a district court determining that there is evidence sufficient to put the case to a jury and later setting a verdict aside as contrary to the weight of the evidence. *United States v. Robinson*, 71 F. Supp. 9, 11 (D.D.C 1947); *United States v. Hayden*, 925 F.2d 1471 (9th Cir. 1991) (affirming district court order denying Rule 29 motion but ordering new trial "predicated in significant part on an evaluation of the credibility of witnesses and on an assessment of the weight of particular evidence"); *United States v. Ferguson*, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (denying Rule 29 motion but granting Rule 33 motion in RICO case because "the evidence [was] too slender a reed to support a guilty verdict"), *aff'd*, 246 F.3d 129 (2d Cir. 2001).

The Court may grant a new trial based on error that was not harmless.  Where error is preserved, the ***government*** bears the burden of proving that the error was harmless. *United States v. Vonn*, 535 U.S. 55, 58 (2002); *United States v. Olano*, 507 U.S. 725, 734-35 (1993) – and, where constitutional error occurs, the government's burden is to prove that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18 (1967). A non-constitutional error is harmful if "one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."

*Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Put another way, the court must be "sure that the error did not influence the jury, or had but very slight effect." *Id.* at 764.

## II.    ARREST OF JUDGMENT

The evidence was insufficient to sustain Jonathan Markovich's and Daniel Markovich's convictions.

### A.    *Healthcare Fraud*

#### 1.    Count One

Count One charged a Healthcare Fraud conspiracy alleging that private insurance plans were falsely billed. Wrapped into it were claims of patient brokering and kickbacks, services billed but not rendered, services medically unnecessary, faulty urine testing, patient recycling and criticism of a "comfort drink" created by the Compass doctor.

Nine insurance carriers were alleged to be victims of false billing.

#### 2.    The Insufficiency

(a) There was no testimony from 7 of the 9 alleged insurance company victims.

(b) The two insurance company testifiers did not say their companies were falsely billed.

(c) There was no testimony that either Markovich participated in the allegedly false billing.

The necessary nexus between the Markovich brothers and false billings was never established.

(d) The Government's proofs regarding alleged kickbacks depended upon legally unreliable witnesses who were not corroborated by independent evidence. Christopher Garnto, Mario Kustura and Adam Adler were incredible as a matter of law; their testimony conflicted at times, no documentary evidence backed up their claims, the documentary evidence presented contradicted these men.

3

(e) The Government's proofs about allegedly unnecessary and unrendered treatment relied upon Dr. Kelly Clark, and a witness, Melissa Parks. This testimony was second-hand and based on a sampling of records that was a cherry-picked; a miniscule selection of Compass and WAR documents, creating a distorted and prejudicial picture. The testimony also failed to tie either Jonathan or Daniel Markovich to knowing and willful participation in any conspiracy.

(f) The assault on the "comfort drink" ridiculed the use of this treatment, without firsthand knowledge of the drink's contents and relying on anecdotal statements about its effect. The only witness with firsthand knowledge about the drink, Paul Buteau, defended the use of this tapering drink. Tapering is an accepted process of slowly decreasing addictive substances. No reliable testimony exists to prove Jonathan or Daniel Markovich thought the drinks use was improper. The evidence was that the drink was administered at the direction of a licensed doctor.

(g) Jesse Munach said he altered notes. But Munach did not say Jonathan Markovich or Daniel Markovich told him to do this or knew he was doing it.  No evidence linked Jonathan to altered notes; any emails insinuating Daniel was aware were devoid of an intent to defraud and there was no correlation to alleged false billings; no evidence of criminal intent.

Nor was there evidence of fraudulent intent in changes to charts. Neither the insurers nor Samantha Moreno (who was not called by the Government) supported fraudulent intent.

3.    The Law

To prove a conspiracy the Government must prove an agreement among two or more parties to violate the law, the defendants' knowledge of and voluntary participation in the conspiratorial agreement, and the commission of an overt act in furtherance of this conspiratorial agreement. *United States v. Hasson,* 333 F.3d 1254, 1270 (11th Cir. 2003).  To establish a defendant's voluntary participation in a conspiracy, the evidence must establish both an intent to

agree and his intent to effectuate the object of the conspiracy.  *United States v. Calderon,* 169 F.3d 718, 723 (11th Cir. 1999).   Since conspiracy is a specific intent crime, the government must prove each defendant had a "deliberate, knowing, specific intent to join the conspiracy."  *United States v. Adkinson,* 158 F.3d 1147, 1153 (11th Cir. 1998).  To establish the requisite level of intent, the evidence of knowledge must be substantial, clear, and unequivocal, not slight.  *United States v. Toler,* 144 F.3d 1423, 1426-7 (11th Cir. 1998).  There is no competent evidence Jonathan or Daniel Markovich voluntarily joined any of the conspiracies charged.

**B.**      ***Substantive Healthcare Charges***

Counts 2-4 charge false billing by Lab Pros, co-indicted defendant Christopher Granto's company, and rest on a general allegation by Granto and opinions by Clark and/or Parks. There is no evidence Jonathan Markovich knew anything about those billings.

The Government alleges Garnto and Jonathan Markovich agreed on a Lab Pros kickback relationship. Monies did go back and forth, but these amounts were explained by loans and advances to Garnto. Such payments were never tied back to the billings charged.

Counts 5-6 charge both Markoviches with specific patient bills submitted by Compass. The insurer, BCBS did not say these were false billings. Nor is there any evidence as to these $4,000 in bills that either Jonathan or Daniel Markovich knew anything about the billing. A third party company, unconnected to the Markoviches, did the billing. After the fact opinions from Clark and Parks do not suffice as proof beyond a reasonable doubt of either falsity or knowledge by either Markovich who were not involved in the billing.

Counts 7-9 relate to three other patient bills in amounts between $1,850 and $5,550. Count 7 is a billing by a different Lab. Counts 8 and 9 came from WAR. No first hand evidence

established that there was anything wrong with the bills. No evidence exists that Jonathan Markovich had anything to do with these billings.

### C.    *Kickback Conspiracy*

Count 10 depends on Garnto and Kustura. Their testimony is inherently unbelievable as to Jonathan and Daniel Markovich.  They paid monies to patients, less than $50,000. No evidence connects Jonathan and Daniel Markovich to these payments. No text or chat connects them. No bank record connects them. No email connects them. No recording connects them. Garnto and Kustura talked freely between themselves in texts and chats about paying people and sending them to California. Neither Jonathan nor Daniel Markovich was a participant in these conversations. Proof of this conspiracy is lacking. Nor do two patients who testified about being paid change this conclusion. Paige Snyder and Ashley Salvatore failed to tie the Markoviches to the payments.

A piece of the kickback claims related to monies advanced for transportation expenses. The funds established as advanced were minimal. There was evidence that the facilities required promissory notes, and that Lissette Rivera tried to collect, and later that a collection company was used. None of this evidence was rebutted by the Government. There was no evidence that either Jonathan or Daniel Markovich believed advancing money was improper.

### D.    *Substantive Kickback Charges*

Counts 12 (DM), 16 (DM) and 18 (JM) relate to specific flights. As to Jonathan Markovich, his company credit card was used, but not by him. No evidence connects him with knowledge of this flight payment. Nor is there evidence that Daniel or Jonathan Markovich intended anything wrong by advancing monies to the patients identified. The three patients identified did not testify.

Count 22 charges Jonathan Markovich regarding a check received from Chris Garnto and Lab Pros. As discussed above, no credible evidence exists to contradict that this money was a loan

repayment. There is no corroboration of Garnto's claims about any agreement between him and Jonathan Markovich.

      **E.**     ***Money Laundering Charges***

Count 24 accuses Jonathan Markovich of participation in a money laundering conspiracy. The only witness relating to this was a summary witness, Jennifer Mila, who could not, and did not, speak to Jonathan Markovich's knowledge or intent. The transactions were ordinary banking transactions regarding Compass and WAR funds. No evidence of concealment was established.

Counts 25-26 charge Jonathan Markovich with Section 1956 violations for 2 deposits into the bank account of Ness Group Foundation. There is no evidence that Jonathan Markovich believed these deposits to be improper. Mila testified Ness is a registered charity. The money is still in the accounts. The fact monies were pledged later as collateral is irrelevant to the charges. There is no evidence of criminal intent.

Counts 27-28 and 30-33 are bank transfers in excess of $10,000, charged against Jonathan Markovich as Section 1957 violations. No credible witness spoke to Jonathan Markovich acting knowingly in these transactions, and the only witness called to specifically address these charges, Mila, could not so testify.

All the money laundering crimes depend on proof of the Healthcare and kickback allegations, which, as discussed above, fail in proof.

Counts 34-35 were bank fraud charges against Jonathan Markovich. No bank witness came to say they were defrauded. The SBA witness, Harris, had no firsthand knowledge of events.

In addition, the accusation required proof that when Jonathan Markovich marked the box in question, he acted knowingly and with intent to defraud. There is no proof regarding such intent. Moreover, the PPP funds were used properly for payroll and expenses.

F.     ***The Government Failed to Prove One Unitary Conspiracy***

The evidence at trial prejudicially varied from the charged offense by creating separate and distinct conspiracies, and thus a judgment of acquittal should follow.  The charging of more than one offense in one count of an indictment is contrary to Rule 8(a) of the Federal Rules of Criminal Procedure, which provides that an indictment contain "a separate count for each offense." Duplicity is the "joining in a single count of two or more separate offenses."  *United States v. Chrane*, 529 F.2d 1236, 1237 n.3 (5th Cir. 1976).  An indictment may not combine multiple conspiracies into a single conspiracy charge.  *Kotteakos v. United States,* 328 U.S. 750, 773 (1946) (reversing conspiracy convictions where evidence demonstrated eight separate conspiracies with a single common actor).

*Kotteakos* explained that in a hub and spoke conspiracy, where the spokes of the conspiracy have no knowledge or connection with any other and are dealing independently with the hub conspirator, there is no single conspiracy.  *Id.* at 754-55.  There is no rim to connect the spokes into a single scheme.  *Id.* at 755.  The Eleventh Circuit has found that if there is no rim to connect the spokes, knowledge is lacking, interdependence is lacking and there is no agreement to the overall conspiracy, but merely separate conspiracies, which require reversal of the conviction.  *See United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004); *United States v. Ellis,* 709 F.2d 688, 690 (11th Cir. 1983).

Here, the Government charged in Count One a unitary conspiracy that operated from April 2017 through October 2020 and involved a conspiracy to commit healthcare fraud and wire fraud. The structure of the allegations, however, and the proof at trial, show a fractured set of possible conspiracies:  billings to insurers; billings by outside laboratories; acts by other service providers;

Garnto paying patients using Mario Kustura and others;  advances to patients for transportation expenses;  alleged inappropriate treatment of patients.

The various spokes were devoid of evidence of a single conspiracy. *Sans* such evidence, the judgment is void.

### III.   NEW TRIAL

#### A.   *Hearsay*

Over objection the Court admitted testimony and documents relating to post-investigation statements by Compass employees who were not called to testify at trial.

The only way an out-of-court statement by a co-conspirator is admissible under Fed.R.Evid. 801(d)(2)(E) is if the government has proven by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant participated in the conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy. *See United States v. Garcia*, 13 F.3d 1464 (11th Cir. 1994) (finding that statement made by co-conspirator prior to the formation of a conspiracy was hearsay); s*ee also United States v. Monaco*, 702 F.2d 860, 876 (11th Cir. 1983). The exception is very limited. *Grunewald v. United States*, 353 U.S. 391, 400 (1957).  *Crawford v. Washington*, 124 S. Ct. 1354, 1374 (2004): "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  *See also United States v. Arbolaez*, 450 F.3d 1283 (11th Cir. June 1, 2006) (finding admission of agent's testimony about statements from an alleged co-conspirator error).

#### B.   *The Testimony Of Doctor Kelly Clark Was Unfairly Prejudicial And Should Have Been Stricken*

Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291

(11th Cir. 2005). In addition, an expert is **not** allowed to intrude on the role of the Court, whose job it is to instruct the jury as to the requirements of law that apply to the particular facts of the case. *See* Fed. R. Evid. 704 commentary; *see also Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1112 (11th Cir. 2005) (stating that, "testifying experts may not offer legal conclusions").

Rather, expert testimony is admissible if it offers something "more than what lawyers for the parties can argue in closing arguments." *Jordan v. Celebrity Cruise Line*, 2018 WL 3584702, at *7 (S.D. Fla. 2018), *citing United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004).

Dr. Clark rendered numerous personal opinions, pejorative side comments and even legal conclusions.  She left the jury with her impression that Compass and WAR by their polices and procedures, and Jonathan and Daniel Markovich, by imputation, purposely violated regulatory and civil laws and medical standards. That was prejudicial error. Her statements exceeded proper bounds:

- . . . "And they [patients] were generally drugged.  They were snowed – when they came into Compass, they were given medications.  They were given those and missed groups.  The policy and procedure manual shows that the clients are supposed to be attending their groups, maybe miss one out of five or six…. " TT 10/4/2021 at 21.

- When shown a picture of a tray of comfort drinks, Dr. Clark testified that "This –this is disgusting.  This looks like a waitress is bringing around weird jello shots for people in a tray to take.  Hey, would you like some of these? This is not how we dispense medication….These look like they – these are not a specific dose.  I can see that one of these is lower in its level than the other one is."  TT  10/4/2021 at 32.

- "This is the result of a drug test.  This is pretty typical of the kinds of extremely large, medically unnecessary drug tests that were done on patients at Compass and WAR."  TT  10/4/2021 at 50.

- When shown a patient record reflecting a telephone order by Dr. Lieberman, Dr. Clark testified "…allegedly ordered by Dr. Lieberman", implying that Dr. Lieberman had not in fact given the telephone order, where there was no evidence that Dr. Lieberman had not given the telephone order.  TT  10/4/2021 at 139.

"Snowed," "suppressed," "disgusting," "these look like," "Hey, would you like some of these," "pretty typical," "allegedly ordered" are examples of her expressions of contempt and disapproval that went far beyond acceptable confines of expert testimony. And her excesses were especially harmful given the fact that her derogatory statements were based on a review of just "10 to 15 percent" (TT 10/21/21 at 185) of patient files, leaving the jury with an extraordinarily skewed portrait, prejudicial to the Markovich brothers.

### C. _The Defense Was Unfairly Limited By Lack Of Access To Patient Data_

The defense, throughout and before trial, sought access to Cognos Audits and comparable spreadsheets identifying all claims paid on behalf of patients identified in the Government's expert's report and analysis. *See e.g.* Motion to Compel [DE 232] filed on July 13, 2021. The defense could not obtain substance abuse records without Government assistance or Court order, both of which were denied. This information was critical to cross examination of Government witnesses and fell within the scope of Brady and its progeny.

The few patients claimed harmed by Compass/WAR was the product of an incomplete picture. The full patient files would have shown that these patients hopped around and were treated at other facilities and lied to Compass and WAR about their own medical histories. Without such records, the defense could not properly cross Dr. Clark or the patients who testified. Dr. Clark acknowledged during her cross examination and mention of 42 CFR that full medical histories are necessary in order to assess the needs of patients.

> Q.   Dr. Clark, you agree that having --- that a treating physician should have a complete picture of a patient's treatment history and medical record?
> A.   Yes, that is helpful.
> Q.   And treatment history for addicts is important because addicts are poor historians?
> A.   So people with addiction can be very poor historians, correct.

TT 10/12/2021 at 52.

The prejudice to the defense was exacerbated and magnified by the fact that the selected medical history records were a feature of the trial and closing; records which were not sought from the insurance companies by the Government, and were, of course, unavailable to the defense.

   **D.**   ***The Testimony Of Melissa Parks Was Beyond The Bounds Of A Legitimate Summary Witness And Was Unfairly Cumulative***

Melissa Parks testified as a purported summary witness.  She sought to bolster the testimony of Dr. Clark.  Her testimony violated Rule 602 Fed. R. Evidence.  She actually offered disguised expert testimony, which was improper and prejudicial.  *See e.g. United States v. Williams,* 81 F.3d 1434 (7th Cir. 1996); *United States v. Casas,* 356 F.3d 104, 119-120 (1st Cir. 2004) (criticizing use of a summary witness whose testimony strayed into opinions and not personal knowledge). She had no personal knowledge of any facts:

> Q:   And you don't know what was happening on ZenCharts, and Ms. de Boer kept asking you, in 2017, 2018, 2019?
> A.   Correct.
> Q.   Because the portals you received were from 2020?
> A.   Yes.
> Q.   And just like you don't know what was happening at that time, you don't know where those documents that were attached to emails came from?
> A.   Correct.
> Q.   You don't know if they came from ZenCharts in 2017, 2018, 2019?
> A.   No.
>                                        ***
> Q.   And you don't know what was provided to the insurance companies by Compass and WAR?
> A.   No.
> Q.   And you don't know whether the insurance companies had access to ZenCharts?
> A.   No.
> Q.   You don't know whether DCF has access to ZenCharts?
> A.   No.
> Q.   And you don't know whether anyone ever came from an insurance company to Compass or WAR to inspect ZenCharts?
> A.   No
>                                        ***

Q.      And you don't know if Compass regularly reaches out to patients, after they're discharged, asking for information that the insurance company is requesting?

A.      No.

Q.      And the Government didn't provide you emails showing that?

A.      No.

***

Q.      You don't know whether Optum requested for Compass and WAR to make updates to patient charts?

A.      I don't know that.

***

Q.      You don't know if there was an ongoing communication between Optum and Compass between November, 2019, and April, 2020?

A.      I don't know.

TT 10/22/21 at 112 – 117.

### E.      *The Government's Closing Arguments Were Misleading And Unfairly Prejudicial*

Government counsel grossly misstated the evidence, used improper and prejudicial language, engaged in burden-shifting, and unfairly misled the jury during closing arguments. For example, criticizing the defendants for going to trial and not accepting responsibility was highly prejudicial: "Far from accepting responsibility for their crimes, these two men sit here today and continue to deny that they had any role in this." TT 10/29/21 at 138.

Making the case about patients' lives was an improper appeal to jury sympathy. The prosecution arguments were scornful and went too far in personally attacking Jonathan and Daniel Markovich. For instance, Government counsel stated that "This [WAR] looks a lot more like spring break in South Florida than it does like a legitimate rehab. But this is what treatment looked like at Compass and WAR". *See*, TT 10/27/2021 at 140. Government counsel stated that Stephanie Peiffer was fired by Jonathan and Daniel's sister because she came to the Government to tell the truth, even though the evidence was that she was fired for insubordination among other infractions. TT 10/29/2021 at 144-45 ("And when she came to the government, what happened?

13

Jonathan and Daniel's sister, who now runs Compass, fired her.  She was a single mother, and she lost her job because she came in to tell you what she knows, what she witnessed.  This is what happened.").   Throughout, the Government imputed wrongdoing by association: "Daniel batting cleanup for his brother. . . ."  TT 10/29/2021 at 160.  The calumnies exceeded acceptable bounds. *United States v. Rodriguez,* 765 F.3d 1546, 1560 (11th Cir. 1985) (prosecution must not make improper suggestions, insinuations, or assertions calculated to mislead or inflame the passions of the jury).  *See also Hall v. United States,* 419 F.2d 582, 587 (5th Cir. 1969); *United States v. Jefferson,* 432 Fed Appex 382, 390 (5th Cir. 2011) (unpublished).

### F.     *Government Counsels' Conduct During The Trial Was Equally Improper*

During questioning of witnesses, Government counsel crossed the line.  For example, in cross-examining defense witness Joseph DeSimone, counsel suggested the defense should have called his supervisor, Lori Van Valkenburg, to testify.  "Okay. And you're the one that's brought in here to testify when, in fact, it was Lori that had the relationship with the Markoviches?"  TT 10/26/2021 at 91.  Numerous times in the prosecution case, the Government unfairly appealed to jury sympathy. The question to Chris Garnto about his brother Kyle were completely improper and prejudicial. The Government was advised not to bring up Kyle Garnto. TT 10/14/21 at 201:22 – 202:4. The questions to Meredith Feinberg elicited the statement that Compass was killing people. "Q: Finally, why are you testifying here today? A: Because I know that Compass Health killed people, ultimately, and that's what happens with these bad rehabs."  TT  9/27/2021 at 52. There was no evidence that any person died at Compass from a drug overdose. Such gratuitous testimony solicited by the Government was designed to denigrate. Similar utterances by Ashley Salvatore and Stephanie Peiffer were intended to inflame jurors, denying Jonathan and Daniel Markovich a fair trial. "Q: Why are you here testifying today? A: Because I don't want anybody

else getting hurt.  What I did was wrong.  What we did was wrong.  You know, I take responsibility for it.  I feel horrible.  I don't want to hurt anyone.  And if this keeps going on, it's just – kids are dying everywhere.  It's not a joke."  (Salvatore) TT  9/24/2021 at 181.

The  Government  mentioned  Serenity  Ranches,  another  detox  center  in  South  Florida indicted for fraud and abuse several years ago. Mario Kustura, one of the Government's star cooperators in the Markovich trial, worked for Serenity and provided drugs to patients.   The conditions at Serenity Ranches were nowhere close to the nature of Compass/WAR.
Nonetheless, the testimony repeatedly mentioned Serenity Ranches, telling the jury that Serenity Ranches was shut down by the "feds;" "...Serenity Ranch already shut down, everybody has been arrested, well over a year ago in that case..." TT  9/24/2021 at 102-03; "Q: And one thing you mentioned, which I said we would circle back to, is how Serenity Ranch got shut down by the feds. Do you remember that? A: I do."  TT 9/23/21 at 210.  Any implication that Compass/WAR was "like" Serenity Ranches was damaging to the Markoviches and highly prejudicial.  No curative instruction could overcome such damage.

### G. *Over-Emphasis On The Comfort Drink Was Unfairly Prejudicial*

From opening statement to closing argument, the Government derided the use of a comfort drink at Compass.  Dr. Clark speculated that this drink was dangerous.  Chris Garnto and Mario Kustura and others were used to bolster that assertion.  No competent witness was called by the Government to specifically address the contents and purposes of the "comfort drink," and the use of this treatment was not tied into any of the charged crimes.  Given the fact that tapering drinks are medically proper, the belittling of "comfort drinks," and the fact that three of the witnesses who disparaged them (Snyder, Adler, Feinberg) predated the time when the drinks were dispensed, reflected the intentional effort to prejudice the jury.

**H.**     ***The Over-Emphasis On Civil And Regulatory Violations Denied The Markoviches A Fair Trial***

During the trial and over defense objection, the Government exaggerated the alleged shortcomings of Compass and WAR. The Government also asserted possible ethical and regulatory violations at these facilities. ". . . Policy and procedure for a treatment center like this is different than just any other business of policy and procedure?  Because this manual has to go to the state.  And it says proactively to the state, this is what we do.  Your normal business doesn't, like, go to the state licensing and say this is what we do..." TT 10/1/2021 at 234.  "Q: Okay.  What was CEO responsible for? A: The CEO is responsible for the structural system of the program, how it works, making sure that what is happening here is compliant with federal, state, and local requirements, and that what is in this document is actually happening, by doing these monitoring processes and any other monitoring processes that need to be in place.  Q: And based on your review of the patient files, was the system being adequately monitored to make sure it was in compliance.  A: No." TT 10/1/2021 at 238.   From opening statement through closing argument, the prosecution tried to make this case a referendum on Compass and WAR's practices, rather than the specific alleged violations of law.

Such evidence had no legitimate probative value and unfairly prejudiced Jonathan and Daniel Markovich.  Even if viewed as probative under Rule 401, the unfair prejudice of this evidence outweighed any probative value under Rule 403. The overwhelming prejudicial impact of the introduction and admission of that evidence created the actual possibility the jury convicted the Defendant "not for the offense charged but for the extrinsic offense." *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir. 1978). Using evidence of a violation of civil regulations to prove criminal violations is impermissible. *United States v. Wolf*, 820 F.2d 1499, 1505 (9th Cir. 1987); *United States v. Christo,* 614 F.2d 486 (5th Cir. 1980). The Court's cautionary instructions were

not enough to cure the problem the Government created because of the pervasive nature of the Government's *ad hominem* attacks and blending of civil sanctions with criminal liability .

**I.**   ***The Government's Use Of A Summary Witness To Attack Ness Group Foundation And Comments In Closing Regarding The Foundation Were Improper***

Government counsel in closing called Ness Group Foundation "a fake charity" (TT 10/27/21 at 197); this was a direct appeal to juror sympathies and contrary to any evidence.  The Government summary witness, Mila, was used to suggest impropriety, but had no firsthand knowledge regarding the bona fides of the Foundation.  The attacks on Ness Group Foundation were unfairly prejudicial.

**J.**   ***The Government Use Of An SBA Witness With No First-Hand Knowledge Was Improper***

The Government called Althea Harris, who knew nothing about the PPP loans in question, to suggest there was something illegal with regard Jonathan Markovich, who was receiving millions of dollars in insurance payments, seeking a PPP loan. No legal foundation supported her premise. This was improper and unfairly prejudicial.

**K.**   ***The Cumulative Impact Of The Errors Requires New Trial***

 "[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Muñoz*, 150 F.3d 401, 418 (5th Cir. 1998). The First Circuit has explained it this way:

> Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect. In other words, a column of error may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts.

*United States v. Sepulveda*, 15 F.3d 1161, 1195–96 (1st Cir. 1993) (citations omitted); *see also, e.g.*, *Muñoz*, 150 F.3d at 418. The ultimate question is whether cumulative errors "so 'fatally infect[ed] the trial' that they violated the trial's 'fundamental fairness.'" *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004) (citation omitted). Finally, cumulative-error analysis may consider unpreserved errors as well as preserved ones. *See, e.g.*, *Muñoz*, 150 F.3d at 418; *United States v. Garza*, 608 F.2d 659, 665-66 (5th Cir. 1979) *Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978).

This is a case in which cumulative errors carried the day for the Government. That is not acceptable under the law.

## **CONCLUSION**

Defendants Jonathan and Daniel Markovich request that this Court grant this motion for arrest of judgment, or in the alternative, order a new trial.

Respectfully submitted,

*s/ Michael Pasano*
Michael S. Pasano (FBN 475947)
E-mail: MPasano@carltonfields.com
Vanessa Singh Johannes
E-mail: VJohannes@carltonfields.com
CARLTON FIELDS
700 N.W. 1st Avenue, Suite 1200
Miami, Florida 33136-4118
Telephone: (305) 530-0050
    *Counsel for Jonathan Markovich*

*/s/ Bruce S. Rogow*
Bruce S. Rogow
FL. Bar No.: 067999
BRUCE S. ROGOW, P.A.
P.O. Box 749
Cedar Mountain, NC 28718
PH: 954.767.8909
brogow@rogowlaw.com
    *Co-counsel for Jonathan Markovich and Daniel Markovich*

Marissel Descalzo (FBN 669318)
E-mail: mdescalzo@tachebronis.com
Tache, Bronis, and Descalzo, P.A.
150 S.E. 2 Ave., Suite 600
Miami, FL 33131
Tel: 305-537-9565
    *Counsel for Daniel Markovich*

Vanessa Singh Johannes (FBN 1028744)
E-mail: VJohannes@carltonfields.com
Michael S. Pasano (FBN 475947)
Email: MPasano@carltonfields.com
CARLTON FIELDS
700 N.W. 1st Avenue, Suite 1200
Miami, Florida 33136-4118
Telephone: (305) 539-7358
    *Counsel for Jonathan Markovich*

Tara A. Campion
FL. Bar No.: 90944
BRUCE S. ROGOW, P.A.
1199 S. Federal Hwy., #212
Boca Raton, FL 33432
PH: 954.767.8909
tcampion@rogowlaw.com
　　*Co-counsel for Jonathan Markovich and*
　　　　　　*Daniel Markovich*


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 23, 2021, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.


　　　　　　　　　　　　　　*s/ Bruce S. Rogow*　　　　　
　　　　　　　　　　　　　　Bruce S. Rogow