**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-cr-60020-DIMITROULEAS/SNOW**

**UNITED STATES OF AMERICA**

**v.**

**JONATHAN MARKOVICH, and**
**DANIEL MARKOVICH,**

        **Defendants.**

_____/

**UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION FOR ARREST OF**
**JUDGMENT AND/OR FOR NEW TRIAL**

      The United States, through undersigned counsel, hereby opposes Defendants Jonathan and

Daniel Markovich's Joint Motion for Arrest of Judgment And/Or For New Trial [D.E. 452]

("Motion").  Defendants received a fair trial, and the overwhelming evidence supports the jury's

guilty verdicts.  The Government presented evidence from a range of sources—former patients,

co-conspirators, former employees, program witnesses, a medical expert, summary witnesses,

patient files, billing data, emails, text messages, and licensing applications—all of which told a

consistent story about the Defendants' involvement in health care fraud, wire fraud, patient

brokering, and, as to J. Markovich, money laundering and Paycheck Protection Program ("PPP")

fraud.  This extensive evidence belies Defendants' strained suggestion that the Government

"exaggerated" Defendants' conduct or "overemphasized" inculpatory evidence.  [Mot. at 15-16.]

Likewise, Defendants' suggestions that the Court failed to keep out inadmissible hearsay or to

cabin the Government's proof to the conspiracies charged in the Indictment defy reality—the

Defense never moved to strike co-conspirator statements after they were conditionally admitted,

and the Court limited the Government's evidence to the four-corners of the Indictment.  The jury

nonetheless convicted, and the Defendants are stuck with those verdicts.  It is that simple.

## FACTUAL & PROCEDURAL BACKGROUND

### A. The Indictment

On January 19, 2021, the grand jury returned an indictment against J. Markovich, D. Markovich, and six other defendants. [D.E. 110.] J. Markovich was charged in the following counts: Count 1 (conspiracy to commit health care and wire fraud); Counts 2-9 (health care fraud); Count 10 (conspiracy to violate three subsections of the Eliminating Kickbacks in Recovery Act ("EKRA")); Counts 18 and 22 (substantive EKRA violations): Count 24 (money laundering conspiracy); Counts 25-26 (concealment money laundering); Counts 27-28 and 30-33 (money laundering through transactions over $10,000); and Counts 34-35 (bank fraud in connection with PPP loans). Although J. Markovich moved for judgments of acquittal on all counts under Rule 29, those motions were denied.

D. Markovich was charged with Count 1, Counts 2-6, Count 10, Count 12, and Count 16. Judgments of acquittal were entered on Counts 2-4 as to D. Markovich following a Rule 29 motion [D.E. 346], but the Court denied the Rule 29 motion as to all other counts against D. Markovich.

### B. The Trial

After a seven-week trial, the jury convicted both Defendants of every count presented to them, including, as to both Defendants, conspiracy to commit health care fraud and wire fraud (Count 1), conspiracy to violate EKRA (Count 10), and substantive counts of each. J. Markovich was also convicted of multiple money laundering charges and bank fraud charges. The Government presented testimony from fifteen witnesses, consisting of a Department of Children & Families representative, representatives from two private insurers, two former Compass Detox patients (A.S. and P.S.), Mario Kustura, Christopher Garnto, Adam Adler, multiple former employees/vendors (Stephanie Peiffer, Jesse Munach, and Meredith Feinberg), a medical expert

who analyzed multiple patients' files in depth (Dr. Kelly Clark), a forensic accountant who traced

the flow of health insurance monies (Jennifer Mila), a consultant who analyzed trends in the billing

data and patient files (Melissa Parks), and a representative of the Small Business Administration

("SBA") knowledgeable about PPP loans (Althea Harris).

Witness and documentary evidence established the following facts, which suffice to sustain

the convictions:

- J. Markovich co-owned Compass Detox and WAR with Richard Waserstein, and both Markoviches served as CEO of Compass Detox at various times. In their capacity as CEOs, both Defendants submitted or signed licensure applications and paperwork on behalf of Compass Detox, wherein Defendants acknowledged their responsibility for ensuring that Compass Detox and WAR would abide by applicable laws and regulations. *See, e.g.*, GX 122A-B, GX 112; Tr. 9/14/21 at 124:9-16; 153:22-154:10; 173:15-19 (Testimony of Shayla Brown); Tr. 10/1/21 at 234:9-15, 235:3-12, 235:25-236:12, 236:19-238:4, 239:16-240:3 (Testimony of Dr. Kelly Clark).

- Both Defendants spent considerable time on a weekly or even daily basis at Compass Detox and, as to J. Markovich, WAR. Tr. 10/12/21 at 147:16-20, 151:22-152:22 (Testimony of Christopher Garnto).

- Compass Detox and WAR both billed private insurance companies, as did associated providers including laboratories and a chiropractor. These claims were submitted through interstate wires and the insurance companies depended on the truth of the claims, including that services were actually rendered, were rendered as billed, were medically necessary, and were not induced through kickbacks. In total, from April 2017 to October 2020, Compass Detox, WAR, and associated providers billed insurance companies approximately $112 million, of which approximately $28 million was paid. *See, e.g.*, GX 701 (billed/paid summary); *see also* Tr. 9/15/21 at 38:15-39:7, 53:2-56:7, 56:11-21, 106:15-18, 170:16, 171:4-13 (Testimony of Daniel McCurdy and Katherine Gallagher).

- Patients were typically required to attend detox (the most expensive level of care offered by the Defendants' facilities) before attending lower levels of care. The patients were often opioid addicts who would not qualify for inpatient detox unless they could demonstrate an alcohol or benzodiazepine addiction from which they were withdrawing. J. Markovich "coached" patient recruiters on insurance policy coverage and that patients needed to report or test positive for alcohol or benzodiazepine use in order to get covered for more days. Tr. 9/17/21 at 180:24-182:3; 221:10-223:11 (Testimony of Mario Kustura); Tr. 10/12/21 at 212:21-25, 227:21-230:15, 233:4-11, 251:13-252:6 (Testimony of Christopher Garnto); Tr. 10/1/21 at 165:15-166:20 (Testimony of Dr. Kelly Clark).

3

- Patients at Compass Detox were routinely overmedicated, through dangerous quantities and combinations of medications, including a "comfort drink" that was prolifically available and that was invented by Dr. Lieberman for the purpose of keeping patients docile and compliant. *See, e.g.*, GX 802B (photos of comfort drink); GX 591Q (text message received by both Defendants regarding "refrain[ing] from telling patients that we are using the comfort drinks to put everyone to sleep"); GX 705 (summary of comfort drink prescriptions); GX 474, 501, 506, 498, 566, 567, 525, 500, 487, 509, 511, 518, 486, 522, 533 (shift report emails received by both Defendants discussing patients appearing sedated/overmedicated); Tr. 10/12/21 at 233:12-234:6 (Testimony of Christopher Garnto); Tr. 9/17/21 at 39:1-5 and 52:18-54:8 (Testimony of P.S.)[1]; Tr. 9/17/21 at 179:16-180:14, 197:19-199:8, 206:7-207:10, 237:24-240:20, 241:24-242:19 (Testimony of Mario Kustura); Tr. 10/1/21 at 28:10-29:1 (Testimony of Jesse Munach); Tr. 10/1/21 at 148:9-12, 185:1-188:23 (Testimony of Dr. Kelly Clark); Tr. 9/30/21 at 22:2-13, 90:1-19 (Testimony of Stephanie Peiffer).

- Both Defendants were aware that patients were overmedicated, including through the comfort drink; in fact, at times Defendants directed the overmedication of patients themselves, even though neither is a medical professional. *See, e.g.*, GX 591J, 591O, 591T, 470 (text messages and email of Defendants directing medication of patients); Tr. 9/17/21 209:9-213:9 (Testimony of Mario Kustura); Tr. 10/14/21 at 77:3-78:8, 79:14-80:6 (Testimony of Christopher Garnto); Tr. 9/30/21 at 26:6-24 (Testimony of Stephanie Peiffer).

- Therapy sessions at Compass Detox and WAR were often not rendered or absences were tolerated and, when therapy sessions were rendered, they were often conducted by unqualified staff, and consisted of activities with little to no therapeutic value.  For example, Mario Kustura detailed incidents such as yacht excursions that were shown through documentary evidence (patient files and billing data) to have been falsely billed as legitimate therapy. *See, e.g.*, Tr. 9/17/21 at 56:9-57:13 and 71:3-73:9 (Testimony of P.S.); *id.* at 179:16-180:14, 197:19-199:8, 206:7-207:10, 237:24-240:20, 241:24-242:19 (Testimony of Mario Kustura); Tr. 10/12/21 at 211:10-18 (Testimony of Christopher Garnto); GX 851A (yacht video example); Tr. 10/1/21 at 33:19-41:20 (Testimony of Jesse Munach); Tr. 10/1/21 at 175:5-10, 176:5-177:2 (Testimony of Dr. Kelly Clark); GX 850 (yacht photo); GX 969A, 926 (therapy notes from same time as yacht trip); GX 711 (summary of billing on yacht days).

- Patient misbehavior—including fights, not participating in recovery, using drugs, leaving against medical advice to get high and returning, and sexual intimacy—was common and tolerated at Compass Detox and WAR.  *See* Tr. 9/17/21 at 81:18-82:20 (Testimony of P.S.); 10/12/21 Tr. at 157:17-158:9, 159:14-19, 212:10-25 (Testimony of Christopher Garnto);

---

[1]     Contrary to the Defendants' arguments, patient files reveal that in 2019, P.S. was prescribed a "comfort drink," consisting of propranolol, Benadryl, and Zofran.  Even in 2018, before the "comfort drink" was formalized as a prescription in Compass Detox's patient files, the patient files reveal that P.S. was prescribed the same or a similar combination of medications on multiple occasions.

Tr. 10/1/21 at 172:7-18, 176:5-177:17 (Testimony of Dr. Kelly Clark); Tr. 9/30/21 at 57:18-58:4 (Testimony of Stephanie Peiffer).

- Patients received little to no medical oversight at either Compass Detox or WAR.  *See, e.g.*, Tr. 9/17/21 at 65:7-67:9 (Testimony of P.S.); Tr. 10/1/21 at 148:25-8 (Testimony of Dr. Kelly Clark).

- Defendants directed treatment decisions, including how long patients stayed and when they were discharged, based on the amounts that would be paid for the services billed by each patients' health care insurance, and not based on patient care.  *See, e.g.*, GX 591I, 591N, 591G (text messages of Defendants directing patients to stay or be discharged); Tr. 10/12/21 at 159:23-160:3 (Testimony of Christopher Garnto); Tr. 10/14/21 at 16:6-17:3, 24:2-7, 140:16-142:8 (Testimony of Christopher Garnto); Tr. 9/30/21 at 15:23-16:12, 52:24-54:2 (Testimony of Stephanie Peiffer).

- Therapy notes and medical notes were fabricated months after patients were discharged in order to pass insurance audits and, ultimately, be paid for services for which Compass Detox and WAR had billed but had not in fact provided.  This happened, at minimum, thousands of times.  J. Markovich and D. Markovich directed this, and D. Markovich directly participated by backdating altered files to be sent to insurers.  *See, e.g.*, GX 980, 980A-B, 1058, 1112, 1061, 1115, 526, 947A-C, 1055, 1056, 179, 995, 945A, 1004, 541, 599A-C, 997, 1003 (audit emails, corresponding patient file excerpts, and corresponding billing summaries); GX 1110 (summary of altered group notes); Tr. 10/12/21 at 240:2-6 (Testimony of Christopher Garnto); Tr. 10/14/21 at 122:24-129:16 (Testimony of Christopher Garnto); Tr. 10/1/21 at 33:19-41:20 (Testimony of Jesse Munach); Tr. 9/30/21 at 42:15-43:14, 112:2-116:6, 124:20-129:1 (Testimony of Stephanie Peiffer).

- Patients were routinely administered excessive urinalyses, the results of which were not discussed with patients or factored into their treatment.  These tests, which billed for hundreds or thousands of dollars each, were often sent to labs with which J. Markovich and Garnto had kickback relationships, including Garnto's lab from which J. Markovich split profits.  *See, e.g.*, GX 232B (checks from Laboratory Pros to Yeladim 18, LLC); GX 708 (summary of cloned medical necessity statement in UA orders); GX 709 (summary of medical review of point of care UAs before ordering confirmatory UAs); Tr. 10/14/21 at 154:21-155:23, 160:5-167:25, 169:12-22, 170:8-171:17, 172:19-174:21 (Testimony of Christopher Garnto); Tr. 10/1/21 at 173:16-174:4 (Testimony of Dr. Kelly Clark).

- Compass Detox and WAR profited most from patients who were recycled multiple times (including 18 times in the case of patient B.H.).  At any given time the "regulars"—whose misbehavior was often tolerated due to the fact that many of these patients (or their significant others) had good insurance policies—made up a large portion of the patient population.  *See, e.g.*, GX 717 (summary of B.H. admissions); GX 702 (summary of top billed patients); GX 704 (summary of billing for recycled patients); *see also* Tr. 9/17/21 at 61:5-62:18 (Testimony of P.S.); 10/1/21 Tr. at 146:15-21, 147:6-8, 148:13-17, 165:15-166:20 (Testimony of Dr. Kelly Clark); Tr. 9/30/21 at 20:12-16 (Testimony of Stephanie Peiffer).

- Many of the "recycled" patients were offered kickbacks to attend Compass Detox and WAR by a web of patient recruiters who answered to the Defendants. These kickbacks included cash, free interstate flights, drugs, or other incentives such as clothing and technology items. *See, e.g.*, Defense Exhibit 393 (photo of patients on yacht); GX 1127, 1123, 591D (text messages from J. Markovich regarding patients encouraged to use drugs before attending); Tr. 9/17/21 at 190:3-191:5 (Testimony of Mario Kustura); Tr. 9/23/21 at 20:7-21:14 (Testimony of Mario Kustura); Tr. 9/17/21 at 41:9-43:2 and at 101:18-24 (Testimony of P.S.); Tr. 10/12/21 at 166:23-167:9, 169:3-15; 193:7-194:10, 244:23-245:5; 251:13-252:6 (Testimony of Christopher Garnto).

- J. Markovich and D. Markovich participated in the patient brokering at various levels, and J. Markovich supplied money for it. *See, e.g.*, Tr. 9/17/21 at 192:9-17 (Testimony of Mario Kustura); Tr. 10/12/21 at 169:9-15,182:2-183:133, 214:13-215:17, 227:11-17 (Testimony of Christopher Garnto). D. Markovich confronted Mario Kustura when patient brokering rumors got out of hand, directing Mr. Kustura to be smarter about his conduct. *See* Tr. 9/17/21 at 182:7-23. Although D. Markovich sometimes wanted to stop the patient brokering, he continued to tolerate it, in large part because of his brother's insistence. Tr. 10/12/21 at 230:16-232:8, Tr. 10/14/21 at 199:4-199:25 (Testimony of Christopher Garnto).

- Defendants concealed the payment of kickbacks through sophisticated means, including through the use of false promissory notes and patient brokering questionnaires. *See, e.g.*, Tr. 10/14/21 at 34:3-9, 40:16-22, 51:12-53:5, 53:19-54:6, 55:2-8, 56:2-57:13, 74:5-76:24 (Testimony of Christopher Garnto); GX 923E, 923C, 923B, 923A, 923D, 923G.

- J. Markovich, along with Waserstein, laundered proceeds of the health care fraud, wire fraud, and kickback conspiracies, and J. Markovich personally profited to the tune of $5.9 million. J. Markovich laundered these proceeds through a web of shell companies, and even disguised two disbursements as charitable contributions to a charity he established, which performed no charitable purpose. *See, e.g.*, GX 720 (summary of flow of funds); GX 731 (summary of Ness Group Foundation transactions); GX 25-33 (money laundering count summaries); Tr. 10/21/21 at 32:12-37:1, 55:10-62:9 (Testimony of Jennifer Mila).

- J. Markovich applied for two PPP loans on behalf of Compass Detox and WAR, attesting that neither entity was engaged in crimes, when in reality both companies, through his stewardship, were committing fraud and other crimes. Had the bank or the Small Business Administration known about this misrepresentation, the loans would not have been funded. *See, e.g.*, GX 34-35 (bank fraud count summaries); GX 269A, 270A (PPP applications); Tr. 10/21/21 at 97:17-98:24 (Testimony of Jennifer Mila); Tr. 10/22/21 at 138:1-141:25 (Testimony of Althea Harris).

The Court properly instructed the jury as to each element of every charge. [*See* Jury Instructions, D.E. 349.] In addition, the Court gave the following instructions that bear on issues raised by Defendants in their Motion:

- The Court instructed the jury that it should consider the testimony of cooperating witnesses and individuals with a history of drug addiction with more caution. *Id.* at 8-10.

- The Court instructed the jury that it could decide if each party had an equal opportunity or lack of opportunity to call witnesses, and that if witnesses are equally available, they should not draw inferences as to what would be said. *Id.* at 12.

- The Court instructed the jury on the Government's burden of proof and the fact that the Defense has no burden. *Id.* at 2-3.

- The Court instructed the jury on how to evaluate summary witness testimony and expert witness testimony. *Id.* at 7, 13.

- The Court instructed the jury (multiple times) that evidence of regulatory violations does not necessarily mean a crime has been committed, but may be relevant to a Defendant's state of mind. *Id.* at 15; *see also* Tr. 9/14/21 at 120:10-18.

## <u>LEGAL STANDARD</u>

### A. Motion for New Trial.

Rule 33 states that a new trial may be granted only when required by the interests of justice. Although the district court has discretion to order a new trial, this discretion is not unlimited, and the Eleventh Circuit scrutinizes such decisions very closely. *See United States v. Hernandez*, 433 F.3d 1328, 1336 (11th Cir. 2005) ("Although we . . . review a court's denial of a motion for new trial for abuse of discretion, we more closely scrutinize a court's grant of a new trial . . . to assure that the judge does not substitute his judgment for that of the jury.") (internal citations omitted). Moreover, "a district court may not reweigh the evidence and set aside the verdict simply because it feels that some other result would be more reasonable . . . The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985) (citations

omitted) (reversing district court's decision to grant new trial). Indeed, *Martinez* notes that: "Courts are to grant [new trials] sparingly and with caution, doing so only in those really 'exceptional cases'." *Id*. at 1313 (citations omitted).

An error in admitting evidence is not a ground for a new trial unless it "'probably had a substantial influence' on the jury's verdict." *United States v. Rodriguez*, 259 F. App'x 270, 276 (11th Cir. 2007) (quoting *United States v. Stephens*, 365 F.3d 967, 976-77 (11th Cir. 2004)). If an error is identified, the Court must inquire whether the error "was more likely than not a substantial factor" in the conviction. *See Stephens*, 365 F.3d at 980 (remanding for new trial after concluding that district court's evidentiary error "was more likely than not a substantial factor in [the defendant's] conviction").

### B. Motion for Arrest of Judgment.

Although Defendants cite to Rule 34 in support of their Motion, they do not assert that the Court lacks jurisdiction over the charges. Thus, this rule is inapplicable to the current Motion.

## I.   THE EVIDENCE FIRMLY SUPORTS THE JURY'S VERDICTS.[2]

### A. Evidence Overwhelmingly Supports The Health Care Fraud, Wire Fraud, And EKRA Convictions.

As described in detail in the Background section above, Defendants exploited private insurers and patients for their own gain, and repeatedly lied thousands of times over the course of years. The evidence at trial showed that Defendants designed and managed a treatment network that routinely incentivized patients to fail, so that these patients, particularly a core group of repeat patients, could be shuffled through Compass Detox and WAR multiple times. Defendants accomplished this by overseeing a group of patient brokers who not only offered kickbacks to

---

[2]      Defendants attack the sufficiency of the evidence under Rule 34. That Rule has no place in this Motion, as Defendants do not even attempt to argue that the Court lacked jurisdiction over the charges. In any event, the Government outlines the ample evidence supporting the convictions.

some prospective patients, but, more critically, assisted patients in appearing qualified for the most expensive level of care (detox) by helping patients consume drugs and alcohol before admission and coaching patients to exaggerate their usage of alcohol and benzodiazepines.  Defendants knew of, and even encouraged, the over-medication and sedation of patients in order to justify longer treatment stays, and to keep patients docile and compliant.  Defendants directed patients to be discharged or to stay longer regardless of their medical needs, in order to maximize revenue. Defendants knew that patients often were not receiving treatment and therapy and that, to the contrary, patients were routinely permitted to engage in activities that clearly undermined their ability to recover.  Defendants monetized patients in every respect, to the point that even patients' urine was excessively farmed and sent to outside labs for expensive, but ultimately useless, urinalysis testing from which J. Markovich profited.  To cover it all up and to ensure that they made money, Defendants altered scores of documents in patients' medical files to foil insurance audits.  The Government proved all of this and more at trial.

Defendants' attacks on the sufficiency of the evidence merely invite the Court to invade the province of the jury, such as by weighing the credibility of witnesses and considering alternative interpretations of the facts that Defendants wish the jury would have accepted.  For example, Defendants argue that the Government should have prolonged the trial by calling multiple additional insurance company representatives or asked the insurance representatives to testify that they were "falsely" billed.  Proving that the billing was false is the crux of the crime— no witness who was not a participant in the fraud would be able to say that any of the billings were "false."  Indeed, fooling insurance companies to ensure payment of claims was the point of the conspiracy.  But the insurance company representatives authenticated the documents, namely, billing records, that, through other witnesses and evidence, the Government proved were false.

Likewise, Defendants invite the Court to discredit all of the cooperating witnesses by asserting that their testimony was not backed-up by other sources.  To the contrary, much of what these witnesses said was corroborated.  Patients P.S. and A.S. testified that they were offered kickbacks, CashApp and Western Union records showed some kickback payments, flight purchases appeared throughout D. Markovich's personal banking as well as the corporate Compass Detox accounts, and checks from Garnto's lab to a shell company established by J. Markovich (Yeladim 18) show kickbacks derived from Garnto's lab profits.  While the Government did not show the cash flow used to fund patient kickbacks, cash is by nature undetectable, and the jury clearly credited Garnto's testimony regarding the sources of that cash.  And while Defendants continue to cling to promissory notes and vague, belated attempts to recoup limited flight payments *after* Defendants knew of the Government's investigation, the jury properly credited Garnto's testimony—which was corroborated by Kustura and P.S.—that no one was expected to pay back flight money, and that promissory notes and collection efforts were instituted to make these kickbacks appear legitimate since airline purchases created paper trails leading directly to the Markoviches.  As to the substantive kickback charges, the Government Exhibits 12, 16, 18, and 22 contain the documentary evidence supporting each transaction, and the respective Defendant's involvement.

Defendants even go so far to assert, in a single, conclusory sentence, that there was no evidence tying the Markoviches to false billings.  [Mot. at 3.]  This is simply wrong.  Not only did two witnesses (Garnto and Peiffer) detail how the Markoviches directed the alteration of patient files, the Government also presented documents showing, step-by-step, how the Defendants accomplished this.  The Government even had its consultant painstakingly review patients' files from the two versions of the ZenCharts portal to identify thousands of examples of such alterations.

Beyond that, the Government proved that therapy and treatment routinely were not being provided, that patients were routinely put at risk, and that the Defendants knew about and encouraged the conditions that led to this—and that Compass Detox and WAR nonetheless billed for this purportedly legitimate treatment.

Critically, as shown at trial, Defendants, as CEOs, promised DCF in their own Policy and Procedures Manuals (*e.g.*, GX 122A-B, GX 112) that they would conduct quality assurance reviews that, as Dr. Clark testified, would have revealed the grossly inappropriate and even dangerous treatment. In addition, these Policy and Procedures Manuals showed each Defendant representing that, as a CEO of Compass Detox (at various times), they were responsible to ensure proper treatment was provided, in a safe and sober environment, by qualified professionals. They further promised to ensure that patients' addiction treatment at Compass Detox was monitored and reviewed on a regular basis as part of their oversight obligations. The Government proved that the Markoviches failed to do this, and that treatment provided by Compass Detox was often improper.

The Government proved the services billed at Compass were fraudulent through the testimony of patients and employees who observed such treatment, as well as through a medical expert who presented in-depth analysis of multiple patients' admissions, including all of the patients identified in the substantive health care fraud counts in Counts 2-9. *See also* GX 2-9 (count exhibits providing underlying documentary support for charges). While the Defendants call the expert's focus on twelve patients (which actually totaled 5.4 percent of all admissions) "cherry-picking," they ignore the fact that they "cherry-picked" some of these patients themselves, such as B.H. who was recycled to Compass Detox and WAR eighteen times and effectively lived at these facilities for hundreds of days. The Government then showed that what the expert found in select patients was not cherry-picking at all, but in fact was true for larger swaths of patients, as

detailed through Melissa Parks' analyses of trends in billing data and patient files.  Indeed, Ms. Parks provided analysis of a core group of patients such as B.H. discussed throughout the trial who were fraudulently admitted for detox treatment they did not need, and recycled between Compass and WAR, resulting in over $20 million in billings for these 20 patients alone (GX 702).

At bottom, Defendants' criticisms of the Government's evidence at most suggest that the Defendants did not know every detail of every aspect of daily operations.  Of course not; that is why the Defendants relied on multiple other co-conspirators, and manipulated well-intentioned employees, to accomplish the objects of the conspiracies. The Government's proof need not demonstrate that Defendants knew all of the details or participated in every aspect of the conspiracy.  Indeed, a defendant may be convicted of conspiracy even if his or her participation is, relative to his co-conspirators, slight.  *United States v. Guerra*, 293 F.3d 1279, 1285 (11th Cir. 2002).  Rather, the evidence need only show "that the defendant[] knew the essential nature of the conspiracy."  *Id.* at 1269-70 (quotations and citation omitted).  While mere association is not enough, "[a] conspiracy conviction will be upheld … when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to [him or her]."  *United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) (quoting *United States v. Figueroa*, 720 F.2d 1239, 1246 (11th Cir. 1983)); *United States v. Marti*, 294 F. App'x 439, 445 (11th Cir. 2008) (citing *United States v. Mulherin*, 710 F.2d 731, 738 (11th Cir. 1983)).  The Government proved all this and more against the Markoviches

### B. The Money Laundering And Bank Fraud Convictions Are Also Well-Supported By The Same Evidence, As Well As Financial Records.

The evidence discussed above more than suffices to establish J. Markovich's knowledge of the unlawful source of proceeds from private insurance companies (for purposes of the money

laundering charges) and that Compass Detox and WAR were engaged in crimes (for purposes of the PPP bank fraud charges).

As to the money laundering charges, the testimony at trial was uncontroverted that J. Markovich engaged in numerous money transfers involving these proceeds.  Financial analyses, presented through the testimony of FBI forensic accountant Jennifer Mila, established that J. Markovich, along with Waserstein, established numerous companies and bank accounts through which he and Waserstein funneled money; for example, they incrementally funneled millions of dollars in fraud proceeds from Compass Detox and WAR accounts to Waterstone Health Care Management, Asakim 18, Waterstone Capital Management, Right Direction Recovery, and then to other accounts.  That easily suffices to sustain the standard money laundering charges as alleged in Counts 24, 27-28, and 30-33.

As to concealment money laundering, charged in Counts 24-26, financial analysis established, at the very least, strong circumstantial evidence of J. Markovich's intent to conceal the nature and source of health care fraud proceeds.  Moreover, J. Markovich's structuring of the transfers of illicit proceeds through shell companies indicated his guilty knowledge—nothing would have prevented him from transferring funds directly from Compass Detox or WAR's accounts to his personal accounts, instead of moving the money through a labyrinth of accounts, which were only discovered and traced after considerable efforts on the part of the Government that took years to accomplish.  *See United States v. Naranjo*, 634 F.3d 1198, 1208 (11th Cir. 2011) (concealment money laundering charges can be supported by "structuring transactions in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; and using third parties to conceal the real owner; [and] a series of unusual financial moves culminating in the transaction.").  While the Eleventh Circuit has held

that concealment money laundering must be more than a "simple transfer of funds between two accounts, each bearing the parties' correct name," *United States v.* Johnson, 440 F.3d 1286, 129 (11th Cir. 2006), the evidence established that this was not what happened here.

In addition, Jennifer Mila and Christopher Garnto presented evidence that J. Markovich and Waserstein founded a charitable foundation (Ness Group Foundation), which served no identifiable charitable purpose, and instead allowed J. Markovich to deliberately disguise fraud proceeds as "charitable donations." The charity's money, which consisted entirely of these two "donations" of fraud proceeds, was then locked up as collateral for loans extended and used in commercial real estate businesses. The Defense makes much about the fact that the charity's money remained in the accounts, but that is exactly the problem. The charity had no ability to put this money toward any charitable purpose while it was pledged as collateral and used solely to benefit J. Markovich and Waserstein in other commercial ventures.

As to the bank fraud counts (Counts 34-35), the Government presented testimony from an SBA witness who described the PPP program, explained the representations on the PPP applications and the materiality of the representation that the applicant is not engaged in crimes, and authenticated the PPP applications at issue in this case. For the same reason J. Markovich's convictions on the addiction treatment fraud and kickbacks counts stand, his bank fraud convictions do as well.

## II.   THE GOVERNMENT PROVED THE CHARGED CONSPIRACIES.

The Eleventh Circuit "will not reverse a conviction because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is [1] material and [2] substantially prejudiced the defendant." *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (internal quotations and citations omitted). "[T]he jury determines

the question of fact as to whether the evidence establishes a single conspiracy." *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008) (quoting *United States v. Moore*, 525 F.3d 1033, 1042 (11th Cir. 2008)). "A jury's conclusion that a single conspiracy existed should not be disturbed as long as it is supported by the evidence. A material variance will only result if there is no evidentiary foundation for the jury's finding of a single conspiracy, and only then will it need to be determined whether the variance requires reversal, i.e., whether it substantially prejudiced [Defendants]." *Richardson*, 532 F.3d at 1284. To determine whether a jury could reasonably have found that the Government's evidence established a single conspiracy beyond a reasonable doubt, the Eleventh Circuit considers: "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Id.* (quoting *Moore*, 525 F.3d at 102). In that regard, "separate transactions are not necessarily separate conspiracies, so long as the conspirators act in *concert* to further a common goal. If a defendant's actions facilitated the endeavors of other co-conspirators, or *facilitated the venture as a whole*, a single conspiracy is established." *Id.*

Here, the Government readily proved, and the jury could have reasonably concluded, that a single conspiracy existed as charged in Count 1. The Government presented sufficient evidence to support the jury's conclusion that the Markoviches and their co-conspirators "operated toward a common goal," *Richardson*, 532 F.3d at 1285, namely, to defraud insurance companies through the submission (via interstate wire) of insurance claims that falsely indicated that Compass Detox, WAR, and associated providers rendered services, rendered those services as billed, that such services were medically necessary, and that such services were not based on kickbacks. Citing no comparable cases where courts threw out jury verdicts, the Markoviches now simply assert that these are "a fractured set of possible conspiracies," such as separate conspiracies to bill insurance

companies, billing by outside labs, paying patients, and inappropriately treating patients. [Mot. at 8-9.] Every aspect of what the Defendants characterize as separate conspiracies was alleged as part of the manner and means of Count 1 of the Indictment. The patient brokering fueled the patient recycling that enabled continuous billing; the improper treatment and therapy is part of what made these billings false; the labs would have never billed for excessive and medically unnecessary urinalysis if Compass Detox and WAR had not referred such tests to the labs; and those referrals would not have occurred if J. Markovich and Garnto were not receiving a cut of the lab profits. All of this conduct was proven at trial to be "in furtherance of one overarching plan." *United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997).

What is more, Defendants do not dispute (nor could they) the overlap of conspirators and time periods of all of this conduct, with the Defendants being among the "key [men] who directed and coordinated the activities and individual efforts of various combinations of people." *Richardson*, 532 F.3d at 1286 (quoting *Edouard*, 485 F.3d at 1347). And even if there was some variance, Defendants fail to explain why they were prejudiced. They do not claim to have been "unfairly surprised" by the evidence, "unable to prepare" their defense, or that the jury inferred Defendants' guilt from the conduct of other co-conspirators in other conspiracies. *Richardson*, 532 F.3d at 1287. The trial focused on the Markoviches' conduct and knowledge; indeed, they were "the hub of the conspiracy" and, at the Markoviches' request, they were "tried alone," apart from the other defendants in this case awaiting trial. *Id*.

## III.   DEFENDANTS RECEIVED A FAIR TRIAL.

### A.  The Court's Hearsay Rulings Were Proper.

The Court has broad discretion over evidentiary rulings and, here, the Court's hearsay rulings as to co-conspirator statements were proper, and even conservative. Defendants baldly

assert improper hearsay rulings, but identify no actual examples of testimony or exhibits that were improperly admitted, or how such evidence prejudiced them.  To the extent the Defendants are referring to email and text message communications, such statements were properly admitted as business records (indeed, the defense admitted emails and text messages on their own where they had no co-conspirator or statement of party opponent exceptions on which to rely); as statements or acts in furtherance of the conspiracy; as statements of party opponent; and/or as evidence of the Defendants' knowledge or intent.

The vast majority of anything that could have been considered hearsay was in fact evidence of a conspiracy and acts in furtherance thereof.  *See, e.g.*, *United States v. Van Hemelryck,* 945 F.2d. 1493, 1498 (11th Cir. 1991) (statements made in furtherance and in the course of a conspiracy are admissible, assuming proof by preponderance of evidence that a conspiracy existed and that the defendant and declarant were members of it); *United States v. Caraza,* 843 F.2d. 432, 436 (11th Cir. 1989) (If the statement "could have been intended to affect future dealings between the parties," then the statement is in furtherance of a conspiracy.).  The Court routinely admitted such evidence, subject to a motion to strike if it the conspiracy was not proven.  The Defense never made such a motion.  Some of the Court's rulings were quite conservative—even limiting the Government's presentation of evidence of alteration of patient files to only those examples where a Defendant participated in an email chain (as opposed to simply received an email).  Tr. 10/21/21 at 213:23-214:1, 215:11-12.  It would have been reasonable for the Court to allow even more of this evidence in, as it all bears on what the Defendants knew even if they did not respond in writing, yet the Court carefully limited the Government's proof and afforded the Defense an opportunity to strike any and all co-conspirator statements, which they chose not to take.

Even if some statements were improperly admitted as co-conspirator statements, they were otherwise admissible.  For example, statements of employees making Defendants aware of patients' conditions, rumors of kickbacks, or other potential issues at Compass Detox and WAR all bear on Defendants' intent and knowledge.  Finally, Defendants identify no prejudice from potentially improper hearsay rulings, nor could they, as the most incriminating evidence against the Defendants was testimony and documents revealing their own statements and conduct, all of which was admissible and standing alone supports the convictions.

**B.  Dr. Clark's Testimony Was Admissible.**

Dr. Clark's testimony was appropriate, tied to documentary evidence she reviewed, and within the bounds of her expertise.  Defendants cite to four instances where they assert Dr. Clark's testimony crossed a line, yet they did not object at any one of those times.  And Defendants fail to remind the Court of the complete context of some of these statements.  For example, Defendants complain that Dr. Clark, when reading from a patient file, stated that a telephone order was read back and verified by an LPN and "it is allegedly ordered by Dr. Lieberman."  Tr. 10/4/21 at 139:5-7.  Defendants omit that the Government then inquired, "When you say 'allegedly,' what do you mean?"  Dr. Clark explained that "this is what I see over and over again, that somehow it justifies admission, but there's no actual medical note that justifies any of these admissions, if that makes any kind of sense."  *Id.* at 139:9-13.  Dr. Clark was entitled to opine that, in her experience, there was a lack of medical oversight at Compass Detox and WAR, and that these routine telephone admissions devoid of medical justification were one piece of evidence supporting that opinion.  Defendants' remaining critiques simply rehash arguments presented in support of Defendants' motion to exclude Dr. Clark's testimony, which the Court properly denied [D.E. 274].

### C.  Defendants Were Not Entitled To Extraneous Patient Data.

Defendants continue to assert that they were entitled to require the Government to obtain billing and treatment records for hundreds of Compass Detox and WAR patients for their treatment outside of Compass Detox and WAR.  The Court properly denied this motion multiple times.  First, these records were not relevant at the Markoviches' trial.  The issue is not whether or how patients were treated at other addiction treatment facilities, but the medical condition they were in when they were admitted to Compass Detox and WAR, and the treatment they received there.  To the extent treatment at other facilities was relevant, it would only be relevant if known by Compass Detox and WAR's staff at the time, and, in that regard, Defendants had access to prior treatment information reported in Compass Detox and WAR's own patient files and known by its staff (many of whom were still employed by the companies up to and during the trial).  Second, even if this evidence could have been admissible in some fashion, it would not have contravened the weight of the evidence supporting guilt.  Third, the fact that the Government did not obtain this information for the Defense is not a *Brady* or any other discovery violation because the information that the Defendants sought is possessed and controlled by third parties, not the Government.

### D.  Ms. Park's Testimony Was Admissible.

Defendants claim that the testimony of the Government's consultant, Melissa Parks, was improper because she "had no personal knowledge of any facts."  [Mot. at 12.]  Of course not; Ms. Parks is an outside consultant engaged to conduct a review of trends in billing data and patient files.  She did not offer any improper opinion on the quality of treatment; she merely reported the number of times she and her team identified certain trends of interest to the Government.  Far from being cumulative, Ms. Parks' testimony was invited by the Defendants.  Defendants accused the Government of "cherry-picking" patients for review by Dr. Clark; Ms. Parks' analysis showed that

the problems in the treatment of the so-called "cherry-picked" patients were in fact widespread, and appeared again and again. Had the Government been forced to go through numerous patient files in detail with Dr. Clark to address the cherry-picking concern, this already lengthy trial would have lasted eons.

Furthermore, Ms. Parks presented documentary evidence of the altering of patient files that was not cumulative of what any other witness stated, but rather corroborated Garnto's and Peiffer's testimony about what happened in response to insurance audits. Such testimony was necessary to explain how Ms. Parks then went through the two ZenCharts portals and quantified the thousands of instances of such alterations. She had to be allowed to explain *what* alterations she was looking for in order to give context to her summary chart of *how many* such alterations she found.

### E.  The Government's Closing Arguments And Witness Examinations Were Proper.

Defendants also seek a new trial based upon alleged prosecutorial misstatements during closing argument and witness examinations. Defendants' characterizations of these remarks, and their arguments as to why they are improper, lack merit. But even if the Government made misstatements, considering the strength of the evidence and the length of this trial, they were so insignificant in context that they could not possibly have affected the outcome.

To show prosecutorial misconduct, the challenging defendant must show both that: "(1) the remarks [were] improper, and (2) the remarks must [have] prejudicially affect[ed] the substantial rights of the defendant." *United States v. Moran*, 778 F.3d 942, 969 (11th Cir. 2015) (internal citations omitted). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *Id.* The issuance of a curative instruction weights powerfully against a claim of

prejudice.  *See, e.g.*, *United States v. Thomas*, 62 F.3d 1332, 1343 (11th Cir. 1995) (finding that curative instruction rendered improper remark harmless error).

In one of the alleged improper statements that Defendants cite, the Defendants did not even object and, after consulting with the Court, declined to request a curative instruction.  *See* Tr. 10/29/2021 at 138:16-18 (in rebuttal, prosecutor argued that "Far from accepting responsibility for their crimes, these two men sit here today and continue to deny that they had any role in this."); *id.* at 181:2-18.  In other instances, not only did the defense not object, but they criticize the Government for arguing that the jury should accept the Government's interpretation of the facts, such as the fact that a photo of the comfort drink and patients in bathing suits engaging in intimate conduct on a yacht "looks a lot more like spring break in South Florida than it does like a legitimate rehab" or that Peiffer was fired for cooperating with the Government.  Both of these statements are supported by the evidence presented at trial.  The reference to spring break is permissible argument to make the point that treatment was so obviously non-existent that even non-medical professionals like the Markoviches knew better.  Likewise, Defendants take issue with the permissible argument that D. Markovich was "batting cleanup for his brother."  That is a fair conclusion of what the evidence showed—J. Markovich was top of the pecking order, but D. Markovich took steps to carry out the conspiracy that his brother masterminded.

Furthermore, the Government's conduct during witness examinations was also proper.  The only instances that the Defense complains of all resulted in sustained objections.  In any event, the jury had already been instructed that attorneys' statements were not evidence.  Tr. 9/13/21 at 225:15-19.  Thus, there is no prejudice.

The statements by Meredith Feinberg and patient A.S. regarding patients being harmed, even dying, if they do not receive appropriate treatment did not prejudice Defendants, chiefly

because the Defense had already argued in opening statements that "the alternative to coming to treatment is death." Tr. 9/14/21 at 66:3-8 (D. Markovich Opening Statement). In any event, when Defendants objected during Ms. Feinberg's testimony, it was sustained. Defendants did not even object to A.S.'s reference to patients being harmed at Compass Detox. Tr. 9/24/21 at 181:12. Finally, it is hardly a prejudicial or even controversial fact that opioid addicts can overdose and die, or that withdrawal from certain substances can lead to dire medical consequences, even death. These facts were brought up at voir dire, by Defendants in their opening statement, and by numerous witnesses at trial.[3] Indeed, detox services such as the ones Compass purportedly offered are necessary in the first place due to the possible medical consequences to patients, including death (as numerous witnesses testified).

Finally, references to Serenity Ranch were appropriately tied to one or more Defendants' knowledge and were otherwise admissible. For example, J. Markovich had conversations with Garnto and Kustura about being smarter than Serenity Ranch about patient brokering. *See, e.g.*, Tr. 10/12/21 at 170:17-172:8 (Testimony of Christopher Garnto). Indeed, Defendants themselves admitted information about Kustura's involvement with Serenity Ranch (and numerous other treatment centers) to discredit him, and in order to support one of the Defense's main themes: that Kustura and Garnto brought patient recruiting to Compass, and did it for their own benefit and not at the direction of the Defendants.

---

[3]      For example:  D. Markovich's counsel asked both Mr. Kustura and the Government's witness, P.S., about their own overdoses.  Tr. Sept. 17, 2021, 143:7-11; Tr. Sept. 24, 2021, 35:10, 37:22, 43:12, 44:11.  Defense counsel questioned Government witness Jesse Munach about a patient's overdose as well. Tr. Oct. 1, 2021, 104:22-105:5.

### F. Evidence Of The Comfort Drink Was Admissible.

The comfort drink is alleged in the Indictment as part of the manner and means of Count 1. Evidence about its contents, purpose, effect on patients, and role in addiction treatment was all necessary and relevant to prove the allegations in the Indictment. Defendants were free to present counter evidence that the comfort drink was appropriate, that it helped patients, or that Defendants were not involved with it. What the Defendants cannot do is term properly-admitted, yet inculpatory, evidence as "disparaging" or "speculative" and expect the Court grant a new trial.

### G. Evidence Of Civil And Regulatory Violations Was Admissible And The Jury Was Properly Instructed On How To Consider Such Evidence.

The Court twice instructed the jury on how to view evidence of regulatory violations. *See, e.g.*, D.E. 349; *see also* Tr. 9/14/21 at 120:10-18. In any event, the testimony the Defendants now complain of relates to statements in their own Policy and Procedures Manuals. That evidence is relevant to Defendants' state of mind and knowledge about how they were supposed to operate and what oversight they were supposed to have.

### H. Evidence Regarding Ness Group Foundation Was Admissible.

The Government called Ness Group Foundation a "fake charity" because it is a fake charity. Jennifer Mila analyzed this company's corporate and financial records and established that: (1) it was established by J. Markovich, D. Markovich, and Waserstein as a non-profit; (2) its only source of funding was two transfers styled as charitable donations from Compass Detox; (3) those donations were locked up as collateral for loans extended to J. Markovich and Waserstein and used in support of commercial ventures; and (4) there was no other transaction activity indicative of charitable purposes. Tr. 10/21/21 at 60:12-91:12. Based on these facts, the Government properly argued that this was a fake charity designed to conceal the transfer of fraud proceeds.

23

### I. Ms. Harris' Testimony Was Admissible.

The Government disclosed in June 2021 that it intended to call an SBA program witness, and the Defense did not seek to exclude such testimony.  An SBA witness appeared on the Government's witness list circulated to the Defense weeks in advance of the original August 2 trial date, and the Defense did not seek to exclude such testimony.  Ms. Harris's testimony was not objected to for good reason—the Government needed to put on a witness to explain the PPP program so that the jury could evaluate the materiality of the fraudulent statements on the PPP loan applications.  Ms. Harris did not state or suggest that J. Markovich engaged in illegal conduct; to the contrary, she explicitly stated that she had no knowledge about J. Markovich at all.  Tr. 10/22/21 at 134:10-12, 152:8-9.  She simply explained the program and the applications at issue so that the jury could evaluate them.

*     *     *     *

Because none of items of which the Defense complains were actual errors, there is no cumulative impact from these errors.  Even if the Defense has identified some potential errors, they are so minor in view of the overwhelming weight of the evidence that they cannot be deemed to have had an impact on the outcome of the trial.

## **CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Arrest of Judgment and/or New

Trial should be denied.

Dated: January 6, 2022                              Respectfully submitted,

                                                    JUAN ANTONIO GONZALEZ
                                                    UNITED STATES ATTORNEY
                                                    SOUTHERN DISTRICT OF FLORIDA

                                                    JOSEPH S. BEEMSTERBOER
                                                    ACTING CHIEF, FRAUD SECTION
                                                    CRIMINAL DIVISION
                                                    DEPARTMENT OF JUSTICE

                                    By:    */s/ Jamie de Boer*
                                           JAMES V. HAYES (FL Bar # A5501717)
                                           Senior Litigation Counsel
                                           JAMIE DE BOER (FL Bar #A5502601)
                                           Trial Attorney
                                           United States Department of Justice
                                           Criminal Division, Fraud Section
                                           1400 New York Avenue, N.W.
                                           Washington, D.C. 20005
                                           Telephone: (202) 774-4276 (Hayes)
                                           Telephone:  (202) 304-6801 (de Boer)
                                           James.Hayes@usdoj.gov
                                           Jamie.DeBoer@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 6, 2022, I electronically filed the foregoing
document with the Clerk of the Court using CM/ECF.

                                           */s/ Jamie de Boer*