UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CR-60020- DIMITROULEAS

UNITED STATES OF AMERICA

v.

JONATHAN MARKOVICH,

       Defendant.
_____/

## OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

Jonathan Dov Markovich ("J. Markovich"), by and through the undersigned counsel, respectfully files his objections to the Presentence Investigation Report ("PSI") (D.E. 468) and states the following in support thereof. These objections were presented to the government on February 28, 2022, but there has been no resolution and they remain contested. Prior to the March 18, 2022 sentencing hearing, J. Markovich will be filing a sentencing memorandum in support of a downward departure from the sentencing guideline range.

## GENERAL OBJECTIONS

- **Loss amount calculation**

The driving force for J. Markovich's sentencing guideline range of life is the loss amount calculation. Paragraph 54 of the PSI adds 24 levels for a loss amount between $65,000,000 and $150,000,000. However, that loss number is unreasonable, unreliable, and speculative. The Eleventh Circuit has stated that the Court "must base [the loss] estimate on reliable and specific evidence." *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015). The onus is on the government to provide such proof by a preponderance of the evidence, but as of yet, though we are less than two weeks away from J. Markovich's sentencing hearing, they have not. Rather, the government posits that it "will further explain its basis for a reasonable estimate of loss in a

128731839.1

sentencing memorandum or at sentencing." (D.E. 540, p. 5, fn. 3.) Given that the trial in this matter lasted nearly twenty full days and it has been over four (4) months since J. Markovich's conviction, that position is unacceptable. In order to adequately respond, J. Markovich should have the benefit of knowing how the government intends to prove the loss amount it seeks that the Court rely on for sentencing, well prior to the sentencing hearing date.

Moreover, the loss amount in the PSI seems to rely on ***all*** patient billings at Compass Detox ("Compass") and We Are Recovery ("WAR") (collectively, the "Facilities"), despite the fact that the government has consistently stated that the charges in this case and offense conduct only involves a group of "core" patients at the Facilities. Indeed, during its opening statement, the government foreshadowed what subsequent evidence would establish – that only a handful of patients was the basis for its case:

> "Ladies and gentlemen, you're going to hear that hundreds of patients went through Compass Detox, and the Government is not saying that all of these patients were bribed. The Government is not saying that all of these patients were being given drugs to get admitted … [T]he Government is not saying that all patients at Compass Detox were alike. Not all of them were repeat patients. Some of these patients … might have been able to work the program and actually get help. What we're saying is these repeat patients that [the Government has] been talking about, these Florida shufflers, were a core group. You're going to hear their names a lot over the course of this trial."

(Trial Transcript, Opening Statements, 9/14/21, 15:20 – 16:12.)

These so-called "Florida shufflers" were consistently mentioned throughout the trial, as the charges in the indictment stem from their attendance at the Facilities. Even the government's own expert, Dr. Kelly Clark, focused only on twelve (12) patient files – less than 1% of the Facilities' patient population – in the course of her work. (Trial Testimony of Dr. Clark, 10/4/2021, 199:14-20.) As well, codefendants and cooperators Christopher Garnto and Mario Kustura also testified that many patients who attended Compass for treatment were not paid kickbacks or given other incentives to do so. (*See* Trial Testimony of Mr. Kustura, 9/23/21, 141:17-19; Trial Testimony of

Mr. Garnto, 9/23/21, 20:21-21:9, 24:21-25, 44:9-16, and 63:9-21.) Given that the government has consistently advocated that only a handful of patients were impacted by J. Markovich's actions – and that the evidence only supports that theory – it is unclear what reliable and specific evidence the government intends to provide showing that all of the patients' billing data should serve as a basis to calculate the total loss amount.

In addition, the government has relied upon the "core" patients to establish the total loss amount calculations for other defendants in this case – and should do the same here. Specifically, the leader and orchestrator of this entire conspiracy – Richard Waserstein – and the lead patient recruiter and "body broker" – Christopher Garnto – both pled guilty to conspiracy charges. The substantive charge or unlawful activity underlying the charges they pled to – healthcare fraud – should, in theory, drive their sentencing guideline ranges. However, the government is requesting that both of their loss amount calculations be capped between $3,500,000 and $9,000,000 – numbers far less than J. Markovich's loss calculation. *See* D.E.s 246, pp. 7-8, ¶¶ 13 and 15; 506, p. 7, ¶ 13. Notably, the total amount reimbursed to the Facilities for the "core" twelve patients is less than $9,000,000. This is not speculative intended loss or benefits – this is an actual determinative reimbursed amount. Moreover, some of this reimbursed amount is for services actually rendered (that is, therapy conducted; medications properly administered; and so forth). Using this loss amount calculation is fair, just, and reliable and should be the maximum relied upon to calculate J. Markovich's sentencing guideline range. As such, J. Markovich objects to all references in the PSI that list a total loss number exceeding that amount, such as paragraphs 39 and 47.

It is also important to note that R. Waserstein profited more than J. Markovich from the Facilities. As the government concedes, J. Markovich profited approximately $5,000,000 from his operation and ownership of the Facilities, whereas R. Waserstein profited several million more.

3

Such profit/gains calculations by the government do not even account for expenses that J. Markovich personally incurred to operate the Facilities.

- **Lack of specificity as to "patients"**

The government has always proffered that this case is not just about loss and money. Rather, they state that this is about people – the patients who attended treatment at the Facilities. Yet, the government does not do these patients the service of specifying who incurred harm from the alleged fraud or state how they were harmed. Instead, anyone who attended treatment at Compass or WAR is simply lumped together as "patients" harmed by the offense conduct. This is contrary to the evidence presented. For example, patient recruiters did not begin paying patients or providing other incentives to them to attend the Facilities until sometime in mid-or-late 2018 – not when Compass opened its doors in April 2017. (Testimony of Mr. Garnto, 9/23/21, 253:20-23.) Even then, the evidence at trial established that J. Markovich spent millions to open and manage a call center and marketing department, which handled patient admissions for treatment. As well, the "comfort drinks," which the government claims harmed patients, were not prescribed at Compass until Dr. Drew Liebermann began working at the facility, in 2018.

For these reasons, J. Markovich objects to blanket references that the Facilities harmed all patients. The government should specify which patients is it referring to and what harm they intend to show.

- **Chiropractic services**

The government did not present any evidence at trial regarding chiropractic services or that J. Markovich caused illegal billing as to any such services provided by Dr. Jeffrey Draesel. Rather, their own expert, Dr. Clark, stated that Dr. Draesel billed directly for those services and that she did not review the charts regarding his services provided. Any references to Dr. Draesel, his business, or illegal billing by his company should be removed from the PSI, such as page 8,

4

paragraph 12 and page 9, paragraph 22.

- **Four-point "victim" enhancement**

The government has filed objections to the PSI, advocating for a four-point victim enhancement (versus two points) and a recalculation of the guidelines to rely on Count 1 versus Count 24. The government acknowledges that neither of their objections change the current sentencing guideline range. J. Markovich disagrees with the government's objections. As to the latter objection, the PSI is correct as is and has properly grouped the violations in a manner to properly reflect the offense conduct.

As to the four-point victim enhancement, again, the government broadly states, in uncertain and general terms, that "dozens of patients" were paid to attend treatment and "hundreds of patients" were overmedicated. There is simply no evidence showing this. Ambiguous statements by Messrs. Garnto and Kustura, two addicts who have questionable memories, should not be the source of a two-point enhancement, if that is indeed what the government is relying on. Moreover, Dr. Clark, the government's own expert, did not opine that "hundreds" of patients were overmedicated. She looked at twelve patient files – twelve. In addition, despite consistently arguing that this case is only about a handful of "Florida shufflers," the government now seems to claim that all of the Facilities' patients – over a thousand – should be deemed victims. Not only is there no evidence supporting this proposition, but many former patients do not wish to be deemed victims and can explain why it is they should not be viewed as victims for purposes of the PSI. The defense will present evidence of this at the sentencing hearing.

## SPECIFIC OBJECTIONS

For ease of reference, unless otherwise noted above, J. Markovich objects to the specific pages and paragraphs noted below:

1. <u>Page 7, paragraphs 9 and 10</u>: J. Markovich objects to past tense references to

5

128731839.1

Compass and WAR (*e.g.*, "was" or "did"). The Facilities are still operational, and under the management of Tamar Markovich. Past tense references should be changed to present tense and the PSI should clearly state the following: "Compass and WAR are still open and operational." Though the government claims that the current status of the Facilities have no bearing on J. Markovich's offense conduct and sentencing, the PSI implies that the Facilities have been shut down or closed. They have not. They are still treating patients. Further, the PSI should state when Compass and WAR were each established and operational, which was part of the evidence admitted at trial. Compass opened in April 2017 and WAR opened in February 2019. Last, J. Markovich objects to the use of the word "purportedly," as the Facilities were indeed opened for the reasons stated and remain operational for the same.

    2.    <u>Page 8, paragraph 13</u>: The specific dates that Jonathan and Daniel Markovich were CEOs of Compass need to be added. Jonathan was the CEO from April 2017 to October 2019. Daniel was CEO from that time onward. Joseph Santeiro, Jr. was the CEO of WAR from its inception until late 2021.

    3.    <u>Page 8, paragraph 14</u>: The evidence at trial did not establish that payments to patients started in April 2017. Christopher Garnto testified that patients started getting paid to come to Compass in 2018 and the PSI should be corrected to accurately reflect this date.

    4.    <u>Page 8, paragraph 15</u>: J. Markovich objects to this paragraph as written. First, he objects to the use of the word "purportedly" and the first reference to "vulnerable". In addition, "most patients" at the Facilities were not between the ages of 18 and 26. Evidence at trial showed that the majority of the patients at Compass were born between 1971 and 1991, and thus, over the age of 26 at the time of admission. (*See* Trial Testimony of Dr. Clark, 10/4/21, p. 212.) Moreover, J. Markovich objects to the notion that patients were "vulnerable" when the government conceded, as did Dr. Clark and other witnesses, that addicts are manipulative, deceitful, and capable of taking

128731839.1

advantage of others.  (*See, e.g.,* Trial Testimony of P.S., 9-17-2021 at 47, 115.)  The patients here are not like other "vulnerable" victims in cases – they were complicit.  They committed insurance fraud by lying to their insurance providers and using their insurance cards like hotel keys – for a stay at the next best place.  Most of these patients wanted to go to Compass and WAR, a fact that the government cannot dispute and that the defense will establish further at the sentencing hearing.  The evidence at trial established that patients played a key role in being "shuffled" to/from various substance abuse treatment centers and the misuse of their insurance benefits.  Moreover, the government has failed to allege anything other than the patients' addiction to drugs as a reason to identify them as so-called "vulnerable" victims.  The Eleventh Circuit has made clear that drug addicts are not necessarily vulnerable victims for purposes of section 3A1.1, and we decline to categorically classify them as such. *See United States v. Amedeo*, 370 F.3d 1305, 1317 no. 10 (11th Cir. 2004).   In addition, for factual accuracy and completeness, the following should be added to this paragraph: "Evidence at trial showed that Compass had nearly 1,000 patients admitted during the time period at issue in this case.  736 patients had only 1 or 2 admissions to the facility.  The majority of patients were not repeat visitors.  Some of the patients – or their parents – specifically sought out Compass for addiction treatment."  (See DEX 583.)

5. <u>Page 8, paragraph 16</u>: J. Markovich objects to this paragraph as written.  For factual accuracy, the following edits should be made.  This language should be added to the beginning of the paragraph: "According to the government …"  At the middle of the paragraph, the term "some of Compass Detox's patients" should be added – as the evidence at trial did not show, nor did the government argue, that all patients were paid kickbacks (as explained above).  Moreover, the government has never argued that the treatment of all patients were "substandard … and/or were medically unnecessary."  Rather, the government has consistently relied only upon a core group of patients as their basis for this argument.  As such, the paragraph should be modified

7

to reflect the specific patients that the government is relying on for this statement. For factual accuracy and completeness, the following statement should also be added to this paragraph: "Compass and WAR provided services for over one thousand patients. The evidence at trial showed that not all patients at these facilities were paid kickbacks, given drugs, or poorly treated."

6. <u>Page 9, paragraph 17</u>: J. Markovich objects to this paragraph as written. The trial evidence did not establish that majority of patients took the "comfort drink" or had such adverse effects. Rather, only some patients testified to adverse effects and the PSI should reflect that. Moreover, the evidence at trial established that fights occurred at Compass, which is contrary to the use of comfort drinks to keep the patient population "docile and compliant, so that they would remain at Compass Detox." As well, not all patients – such as L.L. and P.D. – took the comfort drinks and were repeat patients that the Facilities. That is not what kept them at the facility. This blanket statement should not be included in the PSI as it is not accurate. In addition, J. Markovich requests that the following sentence be added for factual accuracy and completeness: "Jonathan and Daniel Markovich are not medically trained doctors." After "For example," the caveat "according to the Government…" should be stated, if this sentence is kept by the Court. Further, for factual accuracy and completeness, the following should be added: "The 'comfort drink' was created and implemented by Dr. Drew Liebermann, a board-certified anesthesiologist after he joined Compass in 2018. The 'comfort drink,' now termed the 'wellness drink,' is still in use at Compass, and Florida state regulatory agencies are aware of its use. At trial, a nurse from Compass testified that the comfort drink was used to prevent 'med seeking' by patients, that is to prevent addicts from seeking additional narcotics, and that in this regard, the comfort drink could have a placebo effect."

7. <u>Page 9, paragraph 18</u>: J. Markovich objects to this paragraph as written. There was no evidence presented at trial that established that J. Markovich knew the various uses of these

drugs and this paragraph implies that he did. Given that it does not mention J. Markovich, it should be stricken.

8.  Page 9, paragraph 19: J. Markovich objects to this paragraph as written. Not all patients were provided "little to no medical monitoring" and manifested such alleged symptoms. This is too broad and an overreaching statement. Again, the government needs to name specific patients and be pointed in the poor care and treatment it alleges. Moreover, this paragraph is completely contrary to the evidence presented at trial, through the testimony of Joseph DeSimone and Paul Buteau, who testified that patients are monitored and attended to by the medical and clinical staff at Compass.

9.  Page 9, paragraph 20: J. Markovich objects to this paragraph. The testimony at trial directly refuted this – Jesse Munach, a Government witness, testified that Jonathan and Daniel Markovich did not tell him or otherwise authorize him to fabricate therapy notes, or even know that he was doing so. Rather, he stated he did this, largely, on his own:

> Q. You never told Jonathan Markovich you were faking notes, did you?
>
> A. No.
>
> Q. You never told Jonathan Markovich, Samantha Moreno instructed me to lie about all these things, did you?
>
> A. I did not.

(Trial Testimony of Mr. Munach, 10/1/2021, 84:5-10, 83:23 – 84:13, 123:21 – 125:9.)

Dr. Clark even testified that JM most likely never even reviewed patients' files through ZenCharts. (Trial Testimony of Dr. Clark, 10/4/2021, 236:9-13.) Moreover, Christopher Garnto stated that Jonathan Markovich gave his login to others to use and sign-in, and there was no evidence that Jonathan Markovich himself ever signed into ZenCharts to fabricate therapy notes.

10. Page 9, paragraph 21: Again, J. Markovich objects to the blanket use of "patients" when the trial evidence was specific to certain patients and counts. The PSI should be specific as

to which patients the government is referring to as the basis for its arguments. Also, J. Markovich objects to the use of the word "shell" – there was no evidence at trial that these were "shell" corporations. They were not offshore accounts, hidden accounts, accounts in different persons' names, or otherwise nefarious bank or financial accounts. Last, there needs to be clarity that the monies paid to J. Markovich from Mr. Garnto from Lab Pros was in part to pay back a loan that J. Markovich made to Mr. Garnto. Mr. Garnto testified that he received such a loan from J. Markovich and that he paid it back, with interest. To this end, the following should be added for factual accuracy: "Nearly $100,000 of these monies paid to Jonathan Markovich were payments towards a loan that Christopher Garnto took from Jonathan Markovich. Mr. Garnto had a poor credit history and asked Jonathan Markovich to lend him the money. Mr. Garnto entered into a promissory agreement that he would pay back such money to Jonathan Markovich and he did so pay it back through some of these payments."

11. <u>Page 10, paragraph 23</u>: J. Markovich objects to this paragraph as written. The government must specify how these specific amounts billed were tied to fraudulent or illegal conduct.

12. <u>Page 11, between paragraphs 24 and 25</u>: For factual accuracy and completeness, the following should be added: "J. Markovich did not only use patient recruiters to get patients into Compass and WAR. Indeed, Compass and WAR spent significant amounts of monies towards legitimate marketing efforts, such as FaceBook and Google advertisements and health fairs, at J. Markovich's direction. In addition, Christopher Garnto and Mario Kustura were not only recruiters for Compass and WAR. They also earned significant amounts of monies by illegally recruiting for addiction and substance abuse treatment centers in California and other states."

13. <u>Page 11, paragraph 25</u>: J. Markovich objects to this paragraph as written. Again, this paragraph needs to be specific regarding which patients and dates are being discussed.

10

14. <u>Page 11, paragraph 26</u>: J. Markovich objects to this paragraph as written. Again, this paragraph needs to be specific regarding which patients and dates are being discussed. In addition, for factual accuracy and completeness, the following should be added: "At trial, the insurance company representatives testified that nursing and therapy notes could be entered into an electronic medical record system after the time of service, provided it is truthful information, and that promissory notes could be executed for travel and flights, provided it was a note upon which collection was legitimately sought."

15. <u>Pages 11 and 12, paragraph 27</u>: J. Markovich objects to this paragraph as written. Mr. Garnto did not state all of these monies were for "kickbacks" – in fact, he could not recall what they were for. Some patients, as both Mr. Garnto and patient P.S. testified to, were paid monies for "diapers" and "baby formula". Moreover, for factual accuracy and completeness, the following should be added: "At trial, the government established that a few thousands of dollars was used for patient kickbacks. Yeladim 18 means, in Hebrew, 'my children'."

16. <u>Page 12, paragraph 28</u>: J. Markovich objects to this paragraph as written. There is no evidence that J. Markovich used funds earned from his operation of Compass and WAR to bankroll a "lavish" lifestyle. The government has not established that monies earned at Compass or WAR paid for any of the so-called "lavish" items owned by J. Markovich, such as his vehicles. Moreover, he objects to the use of the words "shell" and "illicit" for the reasons explained above in paragraph 9.

17. <u>Page 13, paragraph 30</u>: J. Markovich objects to this paragraph as written. There is no evidence that J. Markovich attempted to conceal funds in Ness Foundation, versus intending for it to serve as a legitimate charity. Moreover, no funds were ever transferred from the Ness Foundation once it was placed into the account. Last, Mr. Waserstein and his brother, a tax attorney, without direct input from J. Markovich, set up the account and foundation. J. Markovich

followed the advice of R. Waserstein and his brother in setting up this foundation and account.

18.     <u>Page 14, paragraph 33</u>: For factual accuracy and completeness, the following sentence should be added: "There is no evidence or allegation that the PPP loans were in fact used improperly by Jonathan Markovich or others."

19.     <u>Page 17, paragraph 47</u>: J. Markovich objects to this paragraph as written. The term "purportedly" should not be used because, again, the government has not – and cannot – establish that some addicts/patients did in fact receive effective clinical treatment services. Moreover, not all treatment provided to patients were "substandard". As well, the loss amount calculation is incorrect and the use of the term "shell" is inaccurate, for the reasons already stated herein. J. Markovich also objects to the application of a four-level aggravating role adjustment, given that Mr. Waserstein, the leader and organizer of Compass' business model and operations, has received no role adjustment for his criminal conduct. The government appears to apply this enhancement simply because J. Markovich was the CEO of Compass from April 2017 to October 2019. That is an insufficient basis to apply a four-level role adjustment, particularly since others, such as Mr. Waserstein and Mr. Garnto, had a more active and robust role in the offense conduct but do not have the same role adjustment. While these defendants have pled guilty and are cooperating with the government, the government cannot simply bypass the sentencing guideline provisions to account for their cooperation. To do so would render the sentencing guideline provisions meaningless. Instead, a recommended sentence, Section 5K1.1 adjustment, or Rule 35 motion is the appropriate mechanism for the government to account for cooperation. Inconsistency in application of the guidelines in this manner can lead to inequitable and disparate sentences among similarly situated defendants and a trial punishment for those that choose to execute their constitutional rights. Last, for accuracy and completeness, the following sentence should be added: "J. Markovich also expected Christopher Garnto to use legitimate marketing ads and

mechanisms to recruit patients."

20. <u>Page 18, paragraph 50</u>: J. Markovich objects to this paragraph, for the reasons stated above in paragraph 6.

21. <u>Page 19, paragraph 51</u>: J. Markovich objects to this paragraph. The Government did not provide evidence at trial regarding the necessity of, or false billing related to, chiropractic services.

22. <u>Page 20, paragraph 57</u>: J. Markovich objects to the obstruction enhancement. The Guidelines provide that a defendant's offense level can be enhanced by two levels if he willfully obstructed or impeded a prosecution and his obstructive conduct related to his offense of conviction. U.S.S.G. § 3C1.1. To prove obstruction of a health care investigation, the government must show that a defendant "willfully prevent[ed], obstruct[ed], misle[d], delay[ed], or attempt[ed] to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator." 18 U.S.C. § 1518; *see also United States v. Fuertes*, 723 Fed. Appx. 733, 740 (11th Cir. 2018); *United States v. Duperval*, 777 F.3d 1324, 1337 (11th Cir. 2015) (quotation marks omitted).

The government cites two reasons for this obstruction enhancement: (1) that J. Markovich knew or instructed Daniel Foodman, then-counsel for Mr. Waserstein, to submit false records to the government post-complaint and pre-indictment, hoping the government would decline to seek an indictment against him; and (2) J. Markovich testified falsely in a civil deposition involving Compass and a competitor, Evoke. The first reason is stated in the PSI and is absolutely false. J. Markovich did not request that Mr. Foodman submit any materials to DOJ seeking a deferment or no prosecution. Mr. Waserstein submitted these materials on his own, contrary to J. Markovich's advice and wish. Moreover, the materials submitted were gathered by an investigator working for Mr. Foodman, not J. Markovich.

Moreover, to the extent that there are discrepancies in J. Markovich's deposition transcript from a civil matter and the trial outcome here, that is not a proper application of the obstruction enhancement. J. Markovich did not obstruct justice through his deposition testimony and did not seek to use any such deposition transcripts during the government's investigation of this case or the trial. As such, it is unclear how his deposition testimony could have impeded law enforcement from doing their job. To the contrary, the Evoke litigation likely spurred further attention on Compass and the Markoviches, placing them on law enforcement's radar.

23.     <u>Page 22, paragraph 64</u>: J. Markovich objects to this paragraph. The loss amount needs to be recalculated, considering a new total loss amount that is supported by specific and reliable evidence. J. Markovich submits that he should be held responsible for a loss amount no more than $9,000,000 (increasing the offense level by 18 levels, not 24). Further, given that the money laundering did not involve sophisticated means (such as no offshore accounts or accounts in others' names), the two level increase for such conduct should not apply. Further, as mentioned earlier, J. Markovich objects to an enhancement for more than 10 victims. The government needs to be consistent and clear about who the alleged "loss" victims are. They are not the patients, as the patients did not incur financial losses. The "loss" victims are the insurance providers. The government continues to conflate the "loss" victims with the alleged patient victims for this calculation and that is not accurate. At trial, the government named six insurance companies – Aetna, BCBS, Optum, Cigna, Magellan, and Medical Mutual. As such, this enhancement does not apply. Thus, the base offense level should be at a level 24, not 34.

24.     <u>Page 22, paragraph 66</u>: For the reasons stated herein, J. Markovich objects to this enhancement.

25.     <u>Page 23, paragraph 68</u>: For the reasons stated herein, J. Markovich objects to this enhancement.

26. <u>Page 23, paragraph 69</u>: The correct total offense level should be 26, not 44.

## CONCLUSION

Jonathan Markovich respectfully requests that the Court consider his objections to the PSI and revise the PSI in accordance with his positions.

Dated: March 8, 2022             Respectfully submitted,

*s/ Vanessa Singh Johannes*
Vanessa Singh Johannes (FBN 1028744)
E-mail: VJohannes@carltonfields.com
CARLTON FIELDS
700 N.W. 1st Avenue, Suite 1200
Miami, Florida 33136-4118
Telephone: (305) 539-7358
*Counsel for Jonathan Markovich*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 8, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, on behalf of myself and all counsel for Jonathan Markovich. Counsel for the United States, Mr. Hayes and Ms. DeBoer, received a true and correct copy via that manner.

*s/ Vanessa Singh Johannes*
Vanessa Singh Johannes (FBN 1028744)
*Counsel for Jonathan D. Markovich*

128731839.1